## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## MEDFORD DIVISION

CONCERNED FRIENDS OF THE
WINEMA; KLAMATH-SISKIYOU
WILDLANDS CENTER;
WESTERN WATERSHEDS PROJECT;
OREGON WILD; and CENTER FOR
BIOLOGICAL DIVERSITY,

Case No. 1:14-cv-737-CL

**REPORT AND
RECOMMENDATION**

Plaintiffs,

v.

U.S. FOREST SERVICE,
U.S. FISH & WILDLIFE SERVICE,

Defendant,

&

IVERSON MANAGEMENT LIMITED
PARTNERSHIP,

Defendant-Intervenor.

CLARKE, Magistrate Judge:

Plaintiffs bring this action for injunctive and declaratory relief under the Administrative

Procedure Act ("APA"), 5 U.S.C. § 706, alleging: (1) that Defendant U.S. Forest Service

("USFS" or "Forest Service") has violated the National Environmental Policy Act ("NEPA") by

Page 1 – REPORT AND RECOMMENDATION

performing deficient or insufficient environmental analysis in the Antelope Allotment ("the Allotment") in the Fremont-Winema National Forest; (2) the USFS has violated the National Forest Management Act ("NFMA") by authorizing livestock grazing on the Allotment inconsistently with the governing land management plan; and (3) that Defendant U.S. Fish & Wildlife Service ("USFWS") issued a flawed Biological Opinion ("BiOp") concerning the Oregon Spotted Frog ("OSF").

The parties have filed cross-motions for summary judgment on the claims in this case. For these reasons below, the cross-motions should be granted in part and denied in part because (1) while significant changes in the Allotment require renewed NEPA analysis, the timeframe for that analysis is within the purview of the Forest Service, and it has prepared and continues to prepare required NEPA documents, the NEPA claim therefore fails; (2) consistent grazing violations and cattle trespass in the Chemult Pasture, in addition to declining viability of sensitive species populations like OSF, renders the Forest Service's allowance of grazing in the Chemult Pasture at current levels a violation of the relevant management plan under NFMA; and (3) under the ESA, the BiOp's assessment of, and failure to account for, non-lethal take is arbitrary and capricious, as is its resulting conclusion that grazing will not jeopardize OSF.

## BACKGROUND

Chemult Pasture is a 68,000 acre livestock pasture located on the Antelope Cattle & Horse Allotment ("Antelope Allotment") in Klamath County. The Iverson family, which later formed Defendant Iverson LP, has ranched on Chemult Pasture for more than 100 years and their cattle have been grazing there under permit since 1908. Def. Br. at 8 (#92). In 1996, a population of the Oregon spotted frog was discovered in Jack Creek, which runs through the

Chemult Pasture. Sept. 2008 AR 738, 1960.[1] This isolated population is one of five populations

in the Klamath Basin and is located at the highest elevation recorded for the frog. Sept. 2008 AR

2337, 2352, 2861. The Oregon spotted frog has been found within the public and private land

portions of Jack Creek. Sept. 2008 AR 2706, 3933.

Congress required the Forest Service to "consider the use of National Forest lands for

grazing of livestock." *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1097 (9th Cir.

2003) (citing 16 U.S.C. § 1604(e)(1) (NFMA)). The Winema Forest Plan ("Forest Plan") is the

governing land management plan for the Chemult Pasture public lands. Sept. 2008 AR 12-204.

The Forest Plan provides that habitat at the forest level shall be managed to maintain viable

populations of existing plants and wildlife. Sept. 2008 AR 113. Under the Forest Plan, all

Forest Service projects, programs, and activities conducted, funded, or permitted shall be

reviewed for possible effects on threatened, endangered, and sensitive animal and plant species.

*Id.*

Livestock grazing on a designated area of land within a national forest, known as an

allotment, is managed by issuing a grazing permit; an allotment management plan ("AMP"); and

an annual operating instruction ("AOI"). *Oregon Natural Desert Ass'n v. Sabo*, 854 F. Supp. 2d

889, 902 (D. Or. 2012). The initial analysis under the National Environmental Policy Act

("NEPA") of the governing AMP for the Antelope Allotment was completed in 1995. Sept.

2008 AR 399-434, 435-36. AOIs do not go through NEPA reviews. Def. Br. at 12 (#92). A

grazing permit sets grazing parameters through a ten-year period, while AOIs convey

instructions to the permittee for annual operations. *Oregon Natural Desert Ass'n v. U.S. Forest

Serv.*, 465 F.3d 977, 980 (9th Cir. 2006). Prior to the beginning of a grazing season, the Forest

---

[1] "AR" refers to the administrative record filed in this case by the Forest Service. Electronic copies of this record are
on file with the Court and available upon request.

Service issues AOIs to grazing permittees. Def. Br. at 11. The Forest Service uses AOIs to respond to changing grazing conditions such as drought, water quality, habitat restoration, or risks to threatened plants or animals. *See Oregon Natural Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d at 980-81. Under a ten-year grazing permit issued in 2006, the Forest Service authorized a maximum of 379 cow/calf pairs to graze on the Chemult Pasture for three months per year. Def. Br. at 9.

In 2004, U.S. Fish & Wildlife Services conducted a Species Assessment of the Oregon spotted frog and listed the frog as a "sensitive species," meaning that its viability is a concern due to significant current or predicted downward trends in populations or habitat. Sept. 2008 AR 2419, 2850, 2854. On August 29, 2014, the Oregon spotted frog was elevated to a "threatened species" listing under the Endangered Species Act ("ESA"). Pl. Br. at 12 (#88); FWS 2218-71.[2] The listing rule identified livestock grazing as a threat to the Jack Creek population, noting in particular the increased threat during low water conditions. FWS 2236. Oregon spotted frogs are the most aquatic of all native frog species in the Pacific Northwest and are almost always found in water. FWS 222, 2225. The frogs concentrate in remnant pools as the creek dries out, and lower water conditions due to drought result in fewer and smaller pools as the summer progresses. FWS 50-51, 54-55, 2235-36, 4700-19; AR 7507-10. Plaintiffs allege that cattle congregate at these same few pools, causing significant harm to the spotted frogs and their habitat. Pl. Br. at 12.

In addition to the Oregon spotted frog, Chemult Pasture is also home to a unique groundwater system of wetlands and fens that support various rare and sensitive plant species. AR 1644, 2344-65. In 2010, the Forest Service's fen expert, Dr. Dewey, surveyed the Chemult

---

[2] The administrative record provided by USFWS underlying the ESA claim is separate than that underlying the NEPA and NFMA claims and will therefore be cited it as "FWS XXXX."

Pasture and other nearby districts for fens and sensitive plants. *Id.* Dr. Dewey found that the

Chemult Pasture was home to "exceptionally numerous fens" compared to other districts. AR

2345, 2347-48, 9850-51. Dr. Dewey stated, "I know of no other, even roughly similar

concentration of fens anywhere else in USFS [Region] 6." Pl. Ex. A. (#88-1). In 2013 and 2014,

Plaintiff's expert, Dr. Simpson, found degraded conditions at many fens on the Chemult Pasture

due to cattle grazing. Simpson Decl. ¶¶ 43-53 (#89). Conditions were worse at fens that retained

water later into the summer because cattle congregated there when other areas dried out.

Simpson Decl. ¶ 63.

In 2008, several plaintiffs brought an action in this court claiming grazing in Chemult

Pasture was harming the Oregon spotted frog. *Center for Biological Diversity v. Wagner*, No.

1:08-cv-302-CL, 2009 WL 2176049 (D. Or. June 29, 2009) (Report and Recommendation by

Magistrate Judge Mark D. Clarke), *adopted*, 2009 WL 2208023 (D. Or. July 22, 2009). After

*Wagner* was filed, the Forest Service decided to build a riparian fence ("Frog Fence"). This court

dismissed the National Forest Management Act ("NFMA") claims as moot because of the Forest

Service's efforts to protect the spotted frog habitat. *Id.* at *13-14. However, despite the Forest

Service's efforts, there has been evidence of repeated trespass of cattle behind the Frog Fence

since installation. Pl. Br. at 6, 8-9.

In 2010, another action was filed challenging grazing on Chemult Pasture. *Sabo*, 854 F.

Supp. 2d at 889. The Forest Service had issued a new list of sensitive species found in the forest

and, therefore, was required to perform a biological evaluation before taking any action that

could affect the sensitive species. *Id.* at 905. This court agreed that the Forest Service had

violated NFMA "by failing to review grazing activities occurring annually on the [Antelope]

Allotment for the possible effects on sensitive species of animals and plants as mandated in the

Forest Plan . . . before authorizing grazing." *Id.* at 920. The Forest Service had also violated NEPA by failing "to undertake supplemental environmental analysis in light of the sensitive species found on the [Antelope] Allotment before authorizing grazing . . ." *Id.* at 923–24.

Although the Forest Service had violated NEPA and NFMA, plaintiffs were not entitled to injunctive relief because the proposed remedy was "not practical, would take a long time to accomplish, and would be very expensive," in addition to harming Iverson LP's business. *Id.* at 900. An injunction could have resulted in a net loss of Oregon spotted frog habitat because Iverson LP would have been forced to graze more intensively on its own private land, which also contains frog habitat. *Id.* Nonetheless, this court did expect the Forest Service to "complete the NEPA and AMP processes on the [Antelope] Allotment in a timely manner, and with serious consideration of the views of plaintiffs and other concerned groups and citizens." *Id.*

Following the *Sabo* decision, the Forest Service issued the 2012 AOI to Iverson LP, allowing grazing on Chemult Pasture. The Forest Service noted repeated trespass of cattle beyond the Frog Fence in its end of season report, but did not issue a noncompliance notice to Iverson LP. Pl. Br. at 13; AR 3361-63.

The Forest Service issued another AOI to Iverson LP in 2013. Cattle trespass continued throughout the 2013 grazing season and in November 2013, the Forest Service sent Iverson LP a Notice of Non-Compliance of Term Grazing Permit. The noncompliance notice notified Iverson LP that from July to October 2013, "livestock were observed either grazing outside of your allotment, on the adjoining Jack Creek Sheep allotment . . . or within areas of your Antelope allotment (Jack Creek Riparian area) that are not currently authorized for livestock grazing." Dhaemers Decl., Ex. E at 1 (#27-5).

Despite these violations and increasing drought conditions, the Forest Service issued the 2014 AOI to Iverson LP, allowing grazing with the same instructions as previous years. Pl. Br. at 13; AR 2904–10, 3704–10, 5150–57 (2012–14 AOIs). Evidence of cattle trespass continued during the 2014 grazing season, and Plaintiffs sent a letter to the Forest Service expressing concerns for the Oregon spotted frog habitat. Pl. Br. at 14; AR 6771–73. In response, the Forest Service ordered Iverson LP to begin removing cattle from the Chemult Pasture one month early. AR 6904; Pl. Ex. B at 2 (#88-2). The Forest Service indicated that Iverson LP had begun removing cattle from the Antelope Allotment on August 26, 2014, but cattle were still found on the Chemult Pasture at the end of September. Pl. Br. at 14; Pl. Ex. B at 2; AR 7314–15. Due to the 2014 violations, the Forest Service issued a notice of permit violation and reduced the number of cattle allowed to graze the Chemult Pasture by 42 cow/calf pairs for two years. Pl. Br. at 14; AR 9438–42; 8995–9001. Iverson LP appealed and the Forest Service changed the penalty to allow the same number of cattle to graze as previous years but reduced the grazing period by two weeks in 2015. AR 8922, 9226–28, 10417–22.

In December 2014, the Forest Service circulated a Draft Environmental Impact Statement ("DEIS") to review the existing grazing management of the Antelope Allotment under the 1995 AMP. Def. Br. at 12. The Forest Service accepted public comments on the DEIS and claims that it is now working towards a Final Environmental Impact Statement ("FEIS") and a revised AMP. *Id.* Publication of the FEIS will trigger the administrative objections process under 36 C.F.R. § 218.5, after which the Forest Service will issue a final decision adopting a new AMP.

Plaintiffs allege that cattle grazing on the Chemult Pasture have continued to access and cause significant ecological harm to the spotted frog habitat, delicate fens, and sensitive plants. Pl. Br. at 6. Plaintiffs challenge the 2012-2015 annual grazing authorizations for the Chemult

Pasture, claiming that the continued grazing violates NEPA and NFMA. *Id.* Plaintiffs also

challenge the June 2015 biological opinion issued by the U.S. Fish and Wildlife Service for

livestock grazing management of the Antelope Allotment. *Id.* Plaintiffs ask for the closure of

Chemult Pasture until a new environmental analysis, allotment management plan, and biological

opinion are completed. *Id.*

## LEGAL STANDARDS

Judicial review of agency action is governed by the Administrative Procedure Act

(APA). 5 U.S.C. § 706. The reviewing court

> must consider whether the decision was based on a consideration of the relevant
> factors and whether there has been a clear error of judgment. Although this
> inquiry into the facts is to be searching and careful, the ultimate standard of
> review is a narrow one. The court is not empowered to substitute its judgment for
> that of the agency.

*Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S. Ct. 814, 28 L.Ed.2d

136 (1971) (citations omitted), *abrogated on other grounds by Califano v. Sanders,* 430 U.S. 99,

97 S. Ct. 980, 51 L. Ed. 2d 192 (1977). Agency decision-making is accorded a "presumption of

regularity." *Akiak Native Cmty. v. U.S. Postal Serv.,* 213 F.3d 1140, 1146 (9th Cir. 2000). While

such review is deferential to the agency action taken, *Lands Council v. Martin,* 529 F.3d 1219,

1225 (9th Cir. 2008), the court must not "rubber-stamp" the agency action as correct. *N. Spotted*

*Owl (Strix Occidentalis Caurina) v. Hodel,* 716 F. Supp. 479, 482 (W.D. Wash. 1988).

As pertinent here, the court may set aside an agency's action if the action is "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law," or if the action is

found to be "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)(D). "'[I]f

an agency fails to consider an important aspect of a problem . . . [or] offers an explanation for the

decision that is contrary to the evidence,' its action is arbitrary and capricious." *Or. Natural Res.*

*Council Fund v. Goodman,* 505 F.3d 884, 888–89 (9th Cir. 2007) (quoting *Lands Council v. Powell,* 395 F.3d 1019, 1026 (9th Cir. 2005)). "An agency action is also arbitrary and capricious if the agency fails to 'articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made.'" *Friends of Wild Swan, Inc. v. U.S. Fish & Wildlife Serv.,* 12 F.Supp.2d 1121, 1131 (D. Or. 1997) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983)).

The parties have filed cross-motions for summary judgment. Because this Court's review under the APA is generally limited to the administrative record, *see infra,* no facts are in dispute. However, summary judgment may be used as a vehicle for the court to conduct its review of the record. Therefore, the Court's role is "to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. INS,* 753 F.2d 766, 769 (9th Cir. 1985).

## DISCUSSION

### I.    NEPA Claim

NEPA exists to ensure that agencies take careful consideration of information related to significant environmental impacts of their proposed actions and to give "the public the assurance that 'the agency has indeed considered environmental concerns in its decision making process.'" *Roberston v. Methow Valley Citizens* Council, 490 U.S. 332, 349 (1989) (quoting *Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 97 (1983)). "NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Id.* NEPA imposes procedural requirements on agencies but "does not contain substantive environmental standards, nor does

the act mandate that agencies achieve particular substantive environmental results." *Bering Strait for Responsible Res. Dev. v. U.S. Army Corps of Engineers*, 524 F.3d 938, 947 (9th Cir. 2008). Judicial review of agency actions under NEPA is limited to determining whether the agency took the requisite "hard look" at the proposed action as required by a strict reading of NEPA. *Id.*

An agency's "hard look" at an action and its environmental impacts includes an environmental assessment ("EA"). *Connor v. Burford*, 848 F.2d 1441, 1446 (9th Cir. 1988). Based on the EA, the agency determines whether to prepare an environmental impact statement ("EIS"). 40 C.F.R. § 1501.4(c). "Until an agency issues a [public] record of decision . . . no action concerning the proposal shall be taken which would have an adverse environmental impact or limit the choice of reasonable alternatives." 40 C.F.R. § 1506.1(a); 40 C.F.R. § 1505.2. The Ninth Circuit interprets "these regulations as requiring agencies to prepare NEPA documents, such as an EA or an EIS, before any irreversible and irretrievable commitment of resources." *Metcaif v. Daley*, 214 F.3d 1135, 1143 (9th Cir. 2000) (internal quotes omitted).

"The duty to prepare an EA is a continuing one and when new information comes to light the agency must consider it, evaluate it, and make a reasoned determination whether it is of such significance as to require a supplemental EA ("SEA") or EIS ("SEIS")." *Or. Natural Desert Ass'n v. Sabo*, 854 F. Supp. 2d 889, 922 (Or. Dist. 2011). Whether that "new information requires supplemental analysis . . . implicates substantial agency expertise." *Tri-Valley CAREs v. U.S. Dept. of Energy*, 671 F.3d 1113, 1130 (9th Cir. 2012). "A court generally must be at its most deferential when reviewing scientific judgments and technical analyses within the agency's expertise under NEPA." *Native Ecosystems Council v. Weldon*, 697 F. 3d 1043, 1051 (9th Cir. 2012). *See, e.g., Oregon Wild v. U.S. Forest Service*, 107 F. Supp. 3d 1102, 1117 (D. Or. 2015) (upholding the Forest Service's decision not to undertake supplemental NEPA analysis); *Oregon*

*Natural Desert Assoc. v. Bureau of Land Management,* 2014 WL 4832218 at *21 (D. Or. Sept. 29, 2014) (upholding BLM decision not to undertake supplemental NEPA analysis).

In the context of NFMA, NEPA analysis is not completed every year, rather, the agency prepares AOIs "specify[ing] those annual actions that are needed to implement the management direction set forth in the project-level NEPA-based decisions." Dkt 2706 at 12–13. Actions in the AOIs "are not required to undergo any additional site-specific environmental analysis." *Id.* Additionally, if the Forest Service has not yet completed an AMP, the agency shall incorporate in grazing permits and leases "such terms and conditions as [it] deems appropriate for management of the permitted or leased lands, pursuant to applicable law." 43 U.S.C. § 1752(e). The Forest Service has "sole discretion" regarding the priority and timing for required environmental analyses with respect to any grazing allotment. 43 U.S.C. § 1752(i).

Defendant's motion for summary judgment should be granted for the NEPA claim for three reasons: (1) the AOIs are not independently subject to a NEPA analysis; (2) it is unclear whether there has been an irretrievable commitment of resources; and (3) the U.S. Forest Service has discretion regarding the timing of issuing new AMPs.

First, AOIs are separate from the NEPA analysis. Plaintiffs argue that the Forest Service's decision to not conduct supplemental NEPA analysis given harms indicated by the AOIs from 2012, 2013, and 2015 violated the Forest Service's NEPA responsibilities, and the expectations voiced by this Court in *Sabo*. Pl. Br. 13. The discovery of sensitive species on the allotment—the Jack Creek OSF population in 1996 and sensitive plant species in 2009—was significant new information requiring supplemental analysis. *Sabo* 854 F. Supp.2d at 922–23. Instead of meeting this Court's expectation that it would perform supplemental NEPA analysis, the Forest Service only completed the required AOIs. While it is clear that the Forest Service

Page 11 – REPORT AND RECOMMENDATION

should have completed the supplemental NEPA analysis expected by this Court in *Sabo*, that

duty is independent from the Forest Service's continued issuance of AOIs. It therefore does not

follow that the Forest Service's issuance of the AOIs alone violated its separate responsibility to

complete supplemental NEPA analysis.

Second, Plaintiffs argue that grazing on the allotment constitutes an irretrievable

commitment of resources such that the Forest Service must prepare separate NEPA documents

from those issued in relation to the AMP, per *Metcalf v. Daley*, 214 F.3d 1135, 1143 (9th Cir.

2000). Plaintiffs argue that under NEPA, "until ongoing analysis is completed and a final

decision issued, the [Forest Service] cannot continue to cause harm to resources that may be

irreversible." Pls.' Reply, 4, ECF No. 98. Plaintiffs allege that livestock grazing is harming the

Allotment, specifically the Chemult Pasture, by contaminating, disturbing, and trampling the

sensitive fens, plants, and Oregon Spotted Frogs living in the habitat. Pl. Br. at 14–15. This

harm results in part from repeated instances of unauthorized grazing in the years since this

court's decision in *Sabo*. *See* AR 2488, AR 3361 (Letters to Defendant-Intervenor documenting

violations and unauthorized use and grazing within the Chemult pasture). Despite the alleged

harms, it is undisputed that the Forest Service has prepared and continues to prepare the NEPA

documents required by *Metcalf*, including an EA issued February 2013, another issued June

2014, and a draft EIS issued December 2014.

The Forest Service is on notice that a revised and updated AMP must be timely

completed, as this Court has previously specified. *Sabo*, 854 F. Supp. 2d at 915. Plaintiffs

argue that, after four years, the Forest Service has flouted its NEPA obligations and this Court's

mandate. The Forest Service, however, has sole discretion to determine when to perform

environmental analyses in the context of AMPs. 43 U.S.C. § 1752(i). While the Court did not

intend its expectation of a "timely" NEPA to span four years, I recognize the Forest Service's continued efforts to produce workable required NEPA documents and I note that the Forest Service offers documents in the record showing its timeframe for environmental analyses. Def. Resp., Ex. A (#92-1).[3]

I reiterate my expectation that the NEPA analysis be performed soon and recommend a date of completion for the AMP and accompanying NEPA analysis commensurate with the current "NEPA Planning Period" provided by the Forest Service in its response, which is 2016. Def. Resp., Ex. A at 3 (#92-1). For these reasons, the parties' cross-motions for summary judgment should be resolved in favor of Defendants as they apply to the NEPA claim, and that claim should be dismissed.

## II.     NFMA Claim

The parties next dispute whether the Forest Service's 2012–15 AOIs violated NFMA by allowing continued grazing in the Chemult Pasture. Plaintiffs argue that the AOIs are inconsistent with and in violation of NFMA's mandates. Pls.' Mot., 16, ECF No 88.

NFMA governs the Forest Service's forest management responsibilities. It requires the Forest Service to develop, maintain, and revise Land and Resource Management Plans ("LRMP") for the nation's forests. 16 U.S.C. § 1604. LRMPs set the tone for forest-specific natural resource management. They guide management activities, set biological and botanical standards, enumerate monitoring requirements, and specify management goals. After preparing and promulgating an LRMP, the Forest Service engages in site-specific planning. Site-specific

---

[3] This document includes a spreadsheet showing the Forest Service's estimated timeframe for various AMP revisions and their environmental analyses. In relevant part, the document shows that the Antelope Allotment's "NEPA Planning Period" is 2016. This is also true of the "Antelope C&H" Allotment. Def. Resp., Ex. A (#92-1).

planning must be consistent with LRMPs. 16 U.S.C. 1604(i); *League of Wilderness Defenders Blue Mtns. Biodiversity Project v. Allen,* 615 F.3d 1122, 1125 (9th Cir. 2008).

The governing LRMP in this case is the 1990 Winema National Forest Plan which includes many goals and objectives. At issue in this case are two of those objectives, which Plaintiffs' allege the Forest Service consistently violates by allowing grazing in the Chemult Pasture: (1) The "riparian directive," which requires the Forest Service to "Maintain or enhance the characteristics of riparian areas, wildlife habitat, and fish habitat near or within riparian ecosystems"; and (2) the "viability directive," which requires the Forest Service to "Manage habitat to maintain viable populations of all existing plant and animal species throughout their existing range on the Forest" and "Manage habitat for perpetuation and/or recovery of plants and animals listed as threatened, endangered, or sensitive."

Plaintiffs' NFMA claim alleges, generally, that the grazing authorizations from the 2012–15 AOIs were inconsistent with the foregoing objectives.[4] Pls.' Mot., 19, ECF No 88. Plaintiffs highlight alleged inconsistencies in the 2014 Antelope Wildlife Report. AR 7462. The Ninth Circuit provides the lens through which to view Plaintiffs' arguments: "While . . . the scope of our review under the APA is narrow . . . we should not endorse [the agency's findings and action] if we cannot determine that the [agency's] conclusions are rationally supported." *Northwest Coalition for Alternatives to Pesticides (NCAP) v. EPA*, 544 F.3d 1043, 1052 n.7 (9th

---

[4] Grazing itself is not inherently inconsistent with NFMA. As described in *Sabo*, under the Federal Land Policy and Management Act of 1976, 43 U.S.C. §§ 1751–53, the Forest Service is authorized to allow livestock grazing on a "designated area of land available for livestock grazing" within a national forest. 36 C.F.R. § 222.1(b)(1). The Forest Service manages livestock grazing on an allotment by issuing a grazing permit; an allotment management plan (AMP); and an annual operating plan (AOP) or instruction (AOI). *Or. Natural Desert Ass'n v. U.S. Forest Serv.,* 465 F.3d 977, 979 (9th Cir. 2006); *Buckingham,* 603 F.3d at 1077. Each of these are site-specific actions that must be consistent with the Forest Plan. *Buckingham,* 603 F.3d at 1077; *Native Ecosystems Council v. Tidwell,* 599 F.3d 926, 934 (9th Cir. 2010). A grazing permit grants a license and establishes the number, kind, and class of livestock; the allotment to be grazed, and the period of authorized use. *ONDA,* 465 F.3d at 980 (citing 36 C.F.R. §§ 222.1–222.4; 43 U.S.C. § 1752). A grazing permit is ordinarily issued for a term of ten years, and may be canceled, modified, or suspended under certain conditions. 36 C.F.R. § 222.4; 43 U.S.C. § 1752.

Cir. 2008). In that case, the Ninth Circuit pointed to the following explanation of the review at

bar, as articulated by the D.C. Circuit:

> Judicial review of agency action requires that the reviewing court consider whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. . . . [S]uch review is not merely perfunctory. We are to engage in a searching and careful inquiry, the keystone of which is to ensure that the [agency] engaged in reasoned decision making.
>
> This formulation points to an acknowledged disparity between the depth of our review and the ultimate scope of that review: Although the ultimate scope may be narrow, the depth must be sufficient for us to be able to comprehend the agency's handling of the evidence cited or relied upon. The purpose of this in-depth review is to educate ourselves so that we can properly perform our reviewing function: determining whether the agency's conclusions are rationally supported. For, although data interpretation and analysis are functions that often lie within an agency's realm of expertise, it is our duty to review those functions to ascertain whether the agency's actions were complete, reasoned, and adequately explained. The mere fact that an agency is operating in a field of its expertise does not excuse us from our customary review responsibilities. And, where the agency's reasoning, although complex, is rational, clear, and complete, we must affirm. Contrarily, where the agency's reasoning is irrational, unclear, or not supported by the data it purports to interpret, we must disapprove the agency's action.

*Id.* (citing *Center for Auto Safety v. Peck,* 751 F.2d 1336, 1373 (D.C. Cir. 1985) (internal

citations and quotation marks omitted).[5] With this scope of review in mind, I turn to the aspects

of the Forest Service's reasoning that arguably lack rational support.

Under the viability directive, Plaintiffs first allege that the Forest Service's finding that

current grazing will have only minor effects on OSF, *see* AR 7532, lacks rational support.

Plaintiffs argue that numerous instances of cattle trespass and resulting degradation recorded

during 2013 and 2014, and discussed above, indicate that "current grazing" is not limited to

simply the permitted grazing, but should also include these unauthorized excesses. Pls.'s Mot.,

19, ECF No 88 (citing AR 3254, 4333, 6832). I agree that the Forest Service's failure to modify

---

[5] *See also Riverkeeper, Inc. v. EPA,* 475 F.3d 83, 103–04 (2d Cir. 2007) ("In a technical area of this sort, it is difficult for judges or interested parties to determine the propriety of the Agency's action without a justification for the action supported by clearly identified substantial evidence whose import is explained.").

its measurements of "current grazing" in the Antelope Allotment to account for cattle trespass and additional unauthorized grazing lacks any rational basis or justified reasoning in the record.

Plaintiffs additionally argue that the Forest Service's determination that grazing will not negatively impact OSF population viability, *see* AR 7535, also lacks rational support. Critically low Jack Creek OSF population is already below viable by any measure, and the Wildlife Report does not explain why additional loss of individual frogs will not further contribute to that decrease in viability. AR 7575; Pls.'s Mot., 19, ECF No. 88.

Furthermore, the Botany Report of record simply lists the number of sites and acres where each sensitive plant species considered therein is found, and *not* the habitat or population objectives or population sizes of the sensitive plant species themselves. AR 4019, 4084. Plaintiffs maintain that the Forest Service erroneously fails to explain the quality and quantity of habitat necessary to support viable populations of the species at issue. Pls.'s Mot., 19, ECF No 88 (citing *Lands Council v. Powell*, 395 F.3d 1019, 1036 (9th Cir. 2005). The Ninth Circuit has analyzed, discussed, and noted its disfavor for the "proxy-on-proxy" approach that the Forest Service allegedly uses here. This approach is employed "to avoid studying the population trends of the Indicator Species by using Indicator Species' habitat as a proxy for Indicator species population trends." *Lands Council,* 395 F.3d at 1036.

The Forest Service posits that it addressed eight sensitive plant species located in or around the Antelope Allotment in its Botany Report. Fed. Defs.' Cross-Mot., 34, ECF No. 92. Four of these species are not found in the Chemult Pasture, and grazing would therefore have no effect on them. AR 4019, 4017–09, 4113. A fifth sensitive plant the Forest Service studied "can easily withstand dry years, fires, herbivory, or other aboveground disturbances. AR 4020. The Forest Service then refers to some affected plants within the Chemult Pasture, all of which, as

reflected in the record, were subject to extensive documentation and detail. The Forest Service argues that the mandate of a more detailed report by a reviewing court is improper and impermissible. Fed. Defs.' Cross-Mot., 35, ECF No. 92. Moreover, in asserting that the Forest Service did not employ the "proxy-on-proxy" strategy condemned by the Ninth Circuit in *Lands Council*, Defendant-Intervenor points to several portions of the Botany Report explaining consideration of the distribution of sensitive plant species and their tolerance to grazing. Def-Int.'s Cross-Mot., 13, ECF No. 94 (citing AR 4076).

Turning to the riparian directive, Plaintiffs point to the fact that a number of fens had greater than 10% soil disturbance; those fens with poor conditions were outside of grazing exclosures. Plaintiffs highlight that the Forest Service fails to explain how maintaining 36% of fens in fair or poor condition is consistent with the Forest Plan's "desired future conditions" to have 90% of riparian areas in good condition. Pls.'s Mot., 21, ECF No 88 (citing AR 2926).

The Forest Service fails to respond in kind to Plaintiffs' individual arguments against the rational basis of its various assumptions, findings, and conclusions in the scientific reports. Instead, the Forest Service argues that the court should not wade into the scientific battle they perceive Plaintiffs are attempting to wage. Fed. Defs.' Cross-Mot., 30, ECF No. 92. The Forest Service maintains that courts should grant the agency significant latitude to decide how best to demonstrate that LRMPs will satisfy the goals of forest plans and, more broadly, NFMA itself. *Id.* (citing *Lands Council v. McNair*, 537 F.3d 987 (9th Cir. 2008)). The Forest Service contends that the *Lands Council* holding defeats Plaintiffs' arguments here. *Id.* at 31.

Finally, the Forest Service argues that Plaintiffs' aforementioned contentions with the Wildlife and Botany Reports under the viability directive, above, are improper because those reports are not final agency actions and are not reviewable under the APA. *Id.* 32. I agree to the

extent that those reports were simply *considered* in support of the agency action at issue, the issuance of the various AOIs. Nonetheless, if the AOIs are predicated on the findings of those reports then the action and, more importantly, the rationale for the action, are properly considered by viewing the AOIs and the Reports in tandem to determine whether they have rational support in the record. *NCAP v. EPA*, 544 F.3d at 1052.

On balance, I find that Plaintiffs' contentions with the Forest Service's actions—the issuance of yearly AOIs—in the context of the 'riparian directive' must be resolved in favor of the Forest Service. *Lands Council* mandates that I grant the Forest Service latitude to determine whether the conditions of sensitive fens are in keeping with the Forest Plan's 'future conditions' goals. 537 F.3d at 992. While Plaintiffs here raise genuine concerns as to whether the Forest Service has taken the degradation of fens into account, and the conditions of fens appear to be demonstrably compromised, it is not within the province of this Court to question the Forest Service's expertise of this issue.

Regarding the viability directive, however, the Forest Service provides no rational support for its failure to accurately measure "current grazing." While Defendants are correct that they may conduct their review of the possible effects of cattle grazing by any reasonable means or methods they choose, *Sabo*, 854 F. Supp. at 921, their failure to properly account for cattle trespass, additional unauthorized grazing, and changing conditions in the relevant areas is not properly afforded the same deference. Even with the Forest Service's issuance of penalties for unauthorized grazing and its measures to address cattle trespass, the "current grazing" measurement must accurately reflect *actual* current grazing to properly indicate the adverse effects of such grazing on the sensitive species populations in the Antelope Allotment. The Forest Service's failure to accurately measure current grazing and the adverse effects on such

Page 18 – REPORT AND RECOMMENDATION

species is arbitrary and capricious, particularly in light of the fact that the viability of OSF

populations, among other sensitive species, is already impaired. Therefore, the Plaintiffs' motion

for summary judgment should be granted in part as it applies to the NFMA claim, and the Forest

Service should be enjoined from issuing future AOIs allowing grazing in the Chemult Pasture

unless it can demonstrate that is has accurately measured grazing in the relevant areas and

accordingly determined that such levels of grazing do not contribute to a negative trend in

viability, per the Forest Service's self-imposed directives in the Winema National Forest Plan.

## III.    ESA Claim

Plaintiffs next challenge the U.S. Fish & Wildlife Service's (USFWS) June 2015

Biological Opinion ("BiOP"). As with LRMPs, courts review BiOps under the APA and must

only set aside BiOps if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law." *Natural Res. Def. Council v. Nat'l Marine Fisheries Serv.*, 421 F.3d 872,

877 (9th Cir. 2005) (quoting 5 U.S.C. § 706(2)(A)). Plaintiffs contend that the BiOp is arbitrary,

capricious, and contrary to the ESA for the following reasons: (1) the BiOp inadequately

described the proposed action; (2) the BiOp's analysis of the effects of the action was flawed; (3)

the BiOp's jeopardy conclusion was unsupported; and (4) the incidental take statement (ITS)

within the BiOp was arbitrary and capricious. Pls.' Mot., 22–34, ECF No 88.

### A.    The BiOp's Description of the Proposed Action

A BiOp must include a detailed discussion of the effects of an agency action on listed

species or critical habitat and must identify and describe the action. 50 C.F.R. § 402.14(h)(2);

*Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 522 (9th Cir. 2010).

Plaintiffs argue that the BiOp did not contain sufficient detail regarding the proposed

allotment management, fence construction, and installation and maintenance of water structures.

Pls.' Mot., 23, ECF No. 88 (citing FWS 2021). The proposed "allotment management" would reopen North Sheep Pasture and the Jack Creek Riparian Unit, which have been closed for fifteen and eight years, respectively. FWS 2020. Plaintiffs argue that the following terms are improperly defined: the proposed management will "minimize impacts" on OSF; the Chemult and North Sheep pastures will "periodically" incorporate a year of rest, without explanation of how often; and the Jack Creek Riparian Unit will use a "high-intensity/low frequency" rotation scheme. Plaintiffs argue that these undefined terms fail to adequately describe the grazing that would occur on each pasture and the monitoring that would supposedly minimize impacts. In response, Federal Defendants contend that 50 C.F.R. 402.14(h) does not clearly specify the required contents of a BiOp. Defendant-Intervenors contend that the BiOp adequately defines some key terms, and those which are lesser-defined are "common knowledge."

While the BiOp fails to define every term used, the Biological Assessment does define some of the key items with which Plaintiffs take issue. *See, e.g.*, FWS 1330–31 (describing both the deferred rotation system and the high-intensity/low-frequency concepts). However, some of the more vaguely defined terms that Defendant-Intervenors claim are "common knowledge" do lack sufficient detail. For instance, the Forest Service relies heavily on an "average 35% utilization standard" to protect OSF. AR 1397, 1402; Fed. Defs.' Cross-Mot., 41, ECF No. 92. Federal Defendants and the record itself provides little explanation of what that means or how the number was reached except that it was used before in a Jack Creek-specific Site Management Plan and that the alternative would be impractical.

**B. The BiOp's Reliance on Mitigation Measures**

When a BiOp's analysis of the effects of an agency action relies on proposed mitigation measures, those measures must be reasonably specific, certain to occur, capable of

implementation, subject to enforceable obligations, and, most importantly, responsive to threats

to the listed species in a way that satisfies ESA's substantive standards. *Ctr. for Biological*

*Diversity v. U.S. Fish & Wildlife Serv.*, 807 F.3d 1031, 1045 (9th Cir. 2015). When a BiOp relies

on uncertain or ineffective mitigation measures, a court may set it aside as arbitrary and

capricious. I analyze the primary mitigation measures at issue below.

## 1. Restoration Measures for Jack Creek Riparian Unit

The BiOp's proposed mitigation measures include plans for the Defendant-Intervenor and

permittee, Iverson Management LLP, to turn over management of private inholdings to USFS to

become part of the Jack Creek Riparian Unit. FWS 2018. This agreement is not finalized. 2026,

2049. If any final agreement between the Forest Service and permittee does not include

objectives that benefit the OSF, there is no certainty that consultation will be reinitiated to

address that discrepancy. Pls.' Mot., 25, ECF No, 88; FWS 2018.

## 2. Fences and Water Troughs

Plaintiffs next point to a history of fences and existing water troughs failing to properly

manage cattle at the Chemult Pasture, the FWS nonetheless relied on these mitigation measures

in reaching its jeopardy conclusion. They argue that it is unreasonable to rely on these items as

measures that would minimize cattle impacts to OSF and OSF habitat. Pls.' Mot., 26, ECF No.

88; FWS 2018.

Federal Defendants respond that new fences are effective; that objective evidence in the

record shows improved hydrologic conditions in fenced areas compared to unfenced areas; and

that even Plaintiffs' expert has acknowledged the efficacy of the Jack Creek riparian fence in

stabilizing OSF habitat. AR 4814. Federal Defendants also highlight that some of the Plaintiffs in

this case previously sought injunctive relief including the installation of miles of riparian fences in *Sabo*. 854 F. Supp. 2d at 898.

Despite the preventative measures taken in the past by the various parties, FWS must rely on mitigation measures that are certain or effective. It has done so here. Fences have improved OSF habitat conditions by reducing the extent of grazing along Jack Creek. The BiOp emphasized that the existing fence, which Plaintiffs had previously advocated for so zealously, needed improvements and repairs to help prevent cattle from accessing restricted areas. Fencing efforts have not been an irrational waste of resources and should not be abandoned as a mitigation measure. The BiOp was not arbitrary and capricious in concluding that new fencing and water troughs will help control cattle access and limit effects of grazing on frogs.

### 3. Average 35% Utilization Standard

Finally, Plaintiffs contend that the average utilization standard, which limits grazing to allow vegetation to remain at a six-inch "stubble height" in order to maintain OSF habitat, is an unreliable mitigation measure because such a measure that "does not adequately address the threats to the species." This argument posits that even a reduced utilization average within the allotment does not, for instance, stop an individual grazing cow from trampling an individual OSF or an OSF egg mass, thereby effecting that population. Pls.' Mot., 27–28, ECF No. 88; FWS 2038. Plaintiffs also note that the utilization standard is not tailored to OSF; and that this one size fits all approach is inappropriate to minimize grazing threats to OSF.

Defendant-Intervenors Iverson Management argue that this mitigation measure reduces "the amount of time cattle spend in a pasture compared to a higher utilization rate which reduces the opportunity for livestock to trample frogs." Def-Int.'s Cross-Mot., 26, ECF No. 94 (citing FWS 2057). Defendants argue that the FWS's reasons for relying upon this mitigation measure

are "sufficiently clear such that the court [need] not speculate as to the basis for the agency's

decision . . . ." *Forest Guardians,* F. Supp. 2d 1082, 1091.

### 4. Allegations of Flawed Assumptions and Assertions

Plaintiffs take issue with the finding that grazing can be beneficial to OSF in reducing

excessive biomass in the various OSF breeding habitats. Plaintiffs bolster the arguments

previously made under the NFMA claim, above, by highlighting a lack of evidence of excessive

biomass in the relevant areas.

The Biological Assessment of record indicates that the biomass in question, an invasive

reed canarygrass species, is a "threat" and poses a risk to OSF. FWS 1317. A new site of reed

canarygrass was found in July 2014, supporting the Federal Defendants' claim that this species

potentially poses a growing risk to OSF, and therefore cattle grazing may carry incidental

benefit. AR 5713. Plaintiffs point to the fact that there is no evidence that the reed canarygrass

sites occur in OSF breeding habitat. Pls.'s Reply, 19, ECF No. 98. Federal Defendants, however,

note outbreaks of the grass in proposed critical OSF habitat. FWS 2046.

While not yet prominent in all OSF habitat, the record supports the contention that reed

canarygrass potentially poses a cognizable threat to OSF. Therefore, at least as it relates to

reducing this particular invasive species, Plaintiffs arguments do not upend the finding that

grazing potentially benefits OSF to this limited degree.

Plaintiffs next argue that the BiOp's findings on the effects of grazing on individual frogs

are unsupported. It found no frogs would be affected by grazing in the North Sheep Pasture of

the Jack Creek Riparian Unit due to a low proportion of Jack Creek OSF population being

present in those two areas. Plaintiffs turn the court's attention to the extra-record evidence

provided by Simpson documenting frogs in the various pools at the North Sheep Pasture and Jack Creek Pasture 4. Second Simpson Decl. ¶ 15, ECF No. 33 (citing AR 4396, 5084, 5091).

Next, Plaintiffs contend that the BiOp's estimation that 3% of frogs are likely to be killed by trampling was scientifically baseless. Pls.' Mot., 30, ECF No. 88 (citing FWS 2059). Federal Defendants maintain that this is a complaint about technical methodology and cite the FWS record at 2057–58, which discusses the methodology used to discern this 3% lethal take of OSF finding. FWS reasons that it came to this 3% number after acknowledging that it was "unaware of any data that would inform the percentage of exposed frogs likely to be trampled because of cattle grazing." FWS 2058. Federal Defendants instead arrived at the 3% number after reasoning that it is likely that only a very small percentage of frogs would be trampled because of short grazing seasons, OSF's ability to jump away, protective riparian fencing, alternate water sources, and placement of salt blocks to draw cattle away from OSF-rich waterbodies. FWS 2058–59.

The BiOp's 3% trampling estimate appears to be little more than a guess for which the record provides no scientific support. A lack of data contradicting the BiOp's 3% estimate does not serve to support the conclusion. The BiOp's 3% trampling assumption is arbitrary and capricious.

### 5. Non-Lethal Take: OSF Displaced or Disturbed by Cattle

Because ESA's "take" definition includes harm and harassment—which constitutes activities that degrade habitat or annoy wildlife to the extent normal behavior patterns are significantly disrupted, 16 U.S.C. § 1532(19), Plaintiffs argue that the BiOp's omission of cattle-caused disturbance and displacement ("non-lethal take") was arbitrary and capricious. Pls.' Mot., 30, ECF No. 88. I agree. While the FWS assessed significant non-lethal take of OSF deriving from cattle disturbance in an initial draft of the BiOp, it excluded that assessment from the final

BiOp. *Compare* FWS 1613 (showing maximum total annual non-lethal take of OSF at 520 individuals) *with* FWS 2065 (omitting non-lethal take altogether).

Federal Defendants offer little reasoning why they do not to include these measures of take of individual OSF, beyond alluding to practical difficulties in finding and measuring bodies of dead or injured OSF. Those difficulties are similarly laid out in the BiOp. FWS 2065. Because of these perceived impracticalities in monitoring, the FWS decided to use a "surrogate"—the average 35% grazing utilization—to determine both lethal and non-lethal take. FWS 2065. In doing so, the significant non-lethal take numbers found in initial drafts of the BiOp were omitted altogether. While I recognize the perceived difficulties in numerically identifying OSF individuals impacted by grazing, those difficulties do not explain why the 35% utilization standard accounts for the initially estimated 520 OSF subject to non-lethal take, or any number for that matter. That "surrogate" is merely a grazing utilization rate rife with assumptions about potential OSF impacts, not a measure of grazing impact on OSF. While I do not question the consulting agency's observations on difficulties of numerical measurement, I find its unexplained omission of non-lethal take from the ultimate BiOp arbitrary and capricious.

Even in light of this glaring flaw in the BiOp, Federal Defendants posit in their briefs and at oral argument that their technical determinations on this issue should receive the highest deference. Fed. Defs.' Reply, 34, ECF No. 101 (citing *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014). I disagree. This does not appear to be a technical determination so much as it is a strategic application of a measurement convention that results in less apparent OSF loss, and it arbitrarily hides the likelihood and amount of non-lethal takee, even despite FWS's initial measurements showing significant non-lethal take before applying the surrogate measurement. Measurement impracticalities cannot be used to pave over the initial

Page 25 – REPORT AND RECOMMENDATION

non-lethal take findings, and arbitrarily choosing a surrogate to supplant actual estimated non-lethal take is not a technical decision entitled to deference. This aspect of the BiOp is patently flawed, and non-lethal take must be revisited upon remand.

### C. The BiOp's Jeopardy Conclusion

Plaintiffs next argue the BiOp's ultimate finding of no jeopardy to the OSF is arbitrary and capricious. The culmination of a BiOp is its jeopardy conclusion, which summarizes and evaluates the potential jeopardy in which an agency action places a listed species. The BiOp at issue finds that grazing is likely to adversely affect OSF habitat and individual OSF. FWS 2054. It also finds that this will be exacerbated by drought conditions. *Id.* The BiOp concludes, however, that grazing will not jeopardize the continued existence of OSF, as the effects will be "short-term" and "spatially limited." FWS 2063. Plaintiffs argue that even spatially limited and short-term impacts can have significant effects on OSF, therefore rendering the BiOp's conclusion unreasonable. Pls.' Mot., 31, ECF No. 88. This argument centers on the Jack Creek OSF population, rather than OSF range-wide. Plaintiffs contend: "Even if the loss of adult frogs from Jack Creek would only minimally reduce the total number of adult frogs in the species, the loss of this population would be very detrimental because of its unique status and distinct genetics." *Id.* at 32 (citing FWS 7, 17, 30). Notably, the Jack Creek OSF's range has lessened by an estimated 76–90%. FWS 2220. Federal Defendants merely contend that it was unnecessary to discuss the specific Jack Creek population in terms of affecting the entirety of the species in the BiOp because FWS did not find that the proposed grazing would result in the loss of that population in the first instance. Fed. Defs.' Reply, 37, ECF No. 101.

Although this issue is convoluted, I note that a number of items Plaintiffs argue are missing from the BiOp here *are* included in various portions of the underlying administrative

records. In *Locke*, 776 F.3d 971, 994 (9th Cir. 2014), the Ninth Circuit held that courts must look to items fairly traceable in the record when evaluating a BiOp. This invalidates a number of Plaintiffs arguments on missing information within the BiOp.

Plaintiffs turn to a case argument in their response, and Federal Defendants take up the argument in their subsequent reply: *Wild Fish Conservancy v. Salazar*, 628 F.3d 513 (9th Cir. 2010). In *Salazar*, the Ninth Circuit held that a BiOp on an action potentially impacting bull trout was arbitrary. That BiOp found that a proposed fish hatchery would reduce demographic and genetic contributions by fishery bull trout to a resident bull trout population in the same area, but concluded that the proposed action was not likely to change current distribution and abundance of bull trout. *Id.* at 527. There was no explanation in the BiOp for this contradiction. Here, Federal Defendants point to the consistency between their own findings and the BiOp's conclusion. That consistency, upon analysis, is irrefutable. FWS found that proposed grazing would not render OSF habitat unsuitable, would have "short-term and spatially limited effects on frogs," and would not completely destroy the Jack Creek population of OSF. Fed. Defs.' Reply, 38, ECF No. 101. These aspects of the jeopardy conclusion should not be subject to revision. However, to the extent the jeopardy conclusion relies on the final BiOp's flawed non-lethal finding, it should be revised accordingly upon remand.

### D. The Incidental Take Statement

In addition to mitigation measures and jeopardy conclusions, BiOps typically include an authorized "take" for the species at issue resulting from the agency action. FWS 2064. This is called an incidental take statement ("ITS"). Plaintiffs attack the BiOp's ITS on the same basis as they do on grazing's effect on individual OSF, as explained above. Like other arguments Plaintiffs levy against the BiOp, Plaintiffs claim the ITS: (1) ignored the non-lethal take from

harm and harassment and (2) improperly relied on the estimated 3% OSF take from trampling derived from the allegedly unsupported average 35% utilization standard. Pls.' Mot., 32–33, ECF No. 88 (citing FWS 2059, 2065).

Plaintiffs also attack the terms and conditions of the ITS, arguing that they are vague as to monitoring requirements, conditions triggering removal of cattle, and conditions triggering re-initiation of consultation. *Id.* at 33. The triggering condition, here, is if the average 35% utilization rate is exceeded by 10% two years in a row in a given pasture. FWS 2068. Plaintiffs question FWS's lack of explanation for why the 2-year, 45% utilization would not exceed allowable take in that duration. Pls.' Mot., 34, ECF No. 88 (citing FWS 2068). The FWS clarifies that the trigger is not a 45% utilization rate but a 38.5% utilization rate ($0.35*0.1=0.035$; $0.35+0.035=0.385$, rounded up to .39 or 39%). The FWS also says that consistent 39% or higher utilization in a given pasture will trigger the USFS's requirement to remove cows grazing in that pasture. Federal Defendants also contend that the 35% average and 39% trigger numbers are derived from sound science. In support of this, however, they point to a 1988 study identifying that a "30%–40% grazing utilization rate is appropriate and sustainable in similar ranges" to that at issue in the BiOp, FWS 3422, as well as a 1999 study indicating that moderate grazing represents a 35%–45% range, and that such grazing is "associated with a slight improvement in ecological conditions." Fed. Defs.' Reply, 41, ECF No. 101 (citing FWS 3427).

Further, Plaintiffs argue that the BiOp underestimated the full impacts grazing could have on OSF. Decl. ¶ 30. They contend that the BiOp did not explain why grazing impacts that perpetuate or accelerate the risk of extirpation for this population are not jeopardizing OSF recovery as a whole. Federal Defendants contend that the 61 adult frogs within Jack Creek are so

isolated from the other 20,501 adult frogs in existence range-wide that whether the Jack Creek frog population grows or not, it has zero effect on the species as a whole.

Meanwhile, the 35% utilization rate that Federal Defendants rest the majority of their argument on is not based on studies conducted in ranges with OSF or dwindling OSF population. While that is obvious and excusable, Federal Defendants do not elucidate the similarities between the ranges in the studies and the range at issue in this case. Though the BiOp supports many of its arguments by referencing the 35% utilization rate, the rate's support in the record is weak and insufficiently supports the BiOp's estimated 3% OSF take from trampling. Similarly, the BiOp fails to discuss the effects caused by the loss of the Jack Creek population on the survival and recovery of OSF as a whole. Federal Defendants' post-hoc explanations cannot substitute for a reasoned analysis in the BiOp.

## IV.    Motion to Strike Extra Record Evidence

Federal Defendants move to strike the second declaration of Theresa L. Simpson. ECF No. 89. They argue that it constitutes an improper post-decisional attack on the agencies' earlier analyses and conclusion. *See* Defs.' Mot. to Strike, ECF No. 89.

The Ninth Circuit applies a post-decisional bar against extra-record evidence. *Tri-Valley CARES v. U.S. Dep't. of Energy*, 671 F.3d 1113 (9th Cir. 2012). Defendants correctly highlight that the Simpson Declaration was prepared after completion of the relevant records and in preparation for the case at bar. They further contend that the administrative record contains a number of entries from Simpson.

While Plaintiffs correctly contend that courts routinely consider extra-record evidence, I find, for the purposes of the instant motions, that Simpson's post-facto and post-decisional declaration does not meet the APA exceptions to the bar proposed by the Ninth Circuit. *See*

sensitive species in the relevant areas. The Forest Service should also be required to demonstrate

that grazing does not violate its requirements under the relevant AMP and the Forest Plan to

maintain the viability of sensitive species populations in range. If the Court adopts this reasoning

and grants this injunction, it should retain jurisdiction to supervise compliance.

### B. BiOp Remand

As articulated above, the BiOp fails to account for non-lethal take of OSF by grazing,

applies an improper surrogate to determine non-lethal take, provides insufficient and improper

support for its use of the 35% utilization standard to determine the effects on OSF from cattle

trampling, and, as a result of those two deficiencies, results in a flawed jeopardy conclusion.

When a biological opinion is unlawful, courts typically vacate and remand for immediate

reinitiation of consultation. Nat'l Wildlife Federation. v. Nat'l Marine Fisheries Serv., 839 F.

Supp. 2d 1117, 1128 (D. Or. 2011) (citing *Fla. Power & Light v. Lorion*, 470 U.S. 729, 744

(1985)). However, district courts have significant latitude in fashioning equitable relief when

necessary to remedy an established wrong, and invalid agency actions may be left in place while

the agency revisits the action. *Id.* at 1129.

The BiOp should be vacated and remanded for re-initiation of consultation. Among other

things, as described above, the BiOp's reasons for ignoring initial measurements of non-lethal

take should be revisited and provided support or, alternatively, vacated and revised. The

employment of the 35% utilization rate as a surrogate for non-lethal take should be reconsidered

and, if still applied, should be provided sound reasoning supported by evidence in the record.

Finally, the BiOp's resulting jeopardy conclusion should be reviewed and corrected accordingly.

*Lands Council*, 395 F.3d at 1029–30. Therefore, Defendant's motion to strike is granted in part and I do not consider the extra-record evidence in reaching my findings above or conclusions below. However, as Defendants concede that the extra-record evidence may be considered for remedy purposes, I do not strike the declaration from the record.

## V.    Injunctive Relief

In order to obtain injunctive relief for their NFMA claim, Plaintiffs must show irreparable injury and a favorable balance of the resulting hardships. *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1184 (9th Cir. 2011). For the ESA claim, they must show irreparable injury. *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1091 (9th Cir. 2015).[6]

### A. NFMA Injunction

Plaintiffs acknowledge that any vacatur of the challenged 2012–15 AOIs "will not affect grazing or management of the Chemult Pasture in 2016 and beyond." Pls.' Response, 32, ECF No. 98. I agree, and therefore decline to vacate those AOIs.

Plaintiffs tailor their request for injunctive relief to seek closure of the Chemult Pasture to allow damaged resources to recover and prevent additional harm until the agencies can demonstrate compliance with any legal requirements this Court has found unmet.

While I do not recommend issuing an injunction closing the Chemult Pasture to grazing altogether, I reiterate my conclusion as to the NFMA claims above: the Forest Service should be enjoined from issuing future AOIs permitting grazing in the Chemult Pasture unless and until those AOIs accurately reflect the actual levels of grazing in the pasture—including cattle trespass, overgrazing—and also accurately reflect the impacts of that level of grazing on the

---

[6] Federal Defendants appear to argue, in their reply to Plaintiffs reply, that Plaintiffs are seeking new injunctive relief for the first time in the latter document. *See* Fed. Defs.' Reply, 41, ECF No. 101. I do not read any inconsistency between the injunctive relief sought by Plaintiff in its motion and subsequent reply, save for a misleading heading in the reply seeming to request permanent injunctive relief. *Compare* Pls.' Mot., 34, ECF No. 88 *with* Pls.' Response, 32, ECF No. 98.

## RECOMMENDATION

For the reasons discussed above, Plaintiffs' Motion for Summary Judgment (#88),

Federal Defendants' Cross-Motion for Summary Judgment (#92), and Defendant-Intervenor's

Cross-Motion for Summary Judgment (#94), and Defendants' Motion to Strike Extra-Record

Evidence (#95) should be resolved as follows:

1. Federal Defendants' motion for summary judgment should be GRANTED in part as it applies to the NEPA claim, and that claim should be dismissed.

2. Plaintiffs' motion for summary judgment should be GRANTED in part as it applies to the NFMA claim, and the opposing motions should be accordingly DENIED. The Forest Service's future issuance of AOIs should be enjoined as described above.

3. Plaintiffs' motion for summary judgment should be GRANTED in part as it applies to the ESA claim, and the opposing motions should be accordingly DENIED. The court should remand the BiOp to the USFWS for re-initiation of consultation to address the deficiencies described above.

4. Defendants' motion to strike should be GRANTED in part and the Simpson Declaration (#89) should not be considered for the purposes of the instant motion, save for remedy considerations.

This Report and Recommendation will be referred to a district judge.  Objections, if any,

are due no later than fourteen (14) days after the date this recommendation is entered.  If

objections are filed, any response is due within fourteen (14) days after the date the objections

are filed. *See* Fed. R. Civ. P. 72, 6.

Parties are advised that the failure to file objections within the specified time may waive

the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

DATED this ___ day of September, 2016.

_____

MARK D. CLARKE
United States Magistrate Judge