Lauren M. Rule (OSB #015174)
Elizabeth H. Potter (OSB #105482)
ADVOCATES FOR THE WEST
3115 NE Sandy Blvd., Ste. 223
Portland, OR 97232
(503) 914-6388
lrule@advocateswest.org
epotter@advocateswest.org

Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## MEDFORD DIVISION

| | |
|---|---|
| **CONCERNED FRIENDS OF THE WINEMA**, **KLAMATH-SISKIYOU WILDLANDS CENTER**, **WESTERN WATERSHEDS PROJECT**, **OREGON WILD**, and **CENTER FOR BIOLOGICAL DIVERSITY**, <br><br> Plaintiffs, <br><br> v. <br><br> **U.S. FOREST SERVICE**, and **U.S. FISH AND WILDLIFE SERVICE**, <br><br> Defendants, <br> _____ | Case No. 1:14-cv-737-CL <br><br> **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' NOTICE OF DEMONSTRATION OF COMPLIANCE WITH COURT'S INJUNCTION OR, IN THE ALTERNATIVE, MOTION TO DISSOLVE INJUNCTION** <br><br> **Oral Argument Requested** |

## TABLE OF CONTENTS

I.    INTRODUCTION ........................................................... 1

II.   LEGAL BACKGROUND .................................................. 2

III.  THE FOREST SERVICE LACKS AUTHORITY TO UNILATERALLY DECLARE THE INJUNCTION IS NO LONGER IN EFFECT. ......................... 4

IV.   PLAINTIFFS OPPOSE DEFENDANTS' REQUEST FOR EXPEDITED CONSIDERATION AND RULING ON THEIR MOTION................................. 5

V.    DEFENDANTS HAVE NOT DEMONSTRATED THAT THE COURT SHOULD DISSOLVE THE INJUNCTION. ........................................ 6

      A.    The Forest Service Has Not Shown That Its Authorization of Grazing In 2018 Complies With The National Forest Management Act Injunction. ... 7

            1.    Defendants' reliance on the new EIS and ROD to demonstrate that 2018 grazing satisfies the injunction is unreasonable.............. 7

            2.    The record shows that the Forest Service has not ensured its grazing management will maintain viable populations of sensitive plants. ........................................................... 13

            3.    The record shows that the Forest Service has not ensured its grazing management will maintain viable populations of Oregon spotted frog. ................................................... 17

      B.    Defendants Have Not Demonstrated The New Biological Opinion Corrected The Legal Deficiencies Found In The Prior Opinion.............. 22

VI.   CONCLUSION................................................................. 23

TABLE OF AUTHORITIES

**Cases:**                                                                                           **Page(s):**

*All. for the Wild Rockies v. Bradford*,
    864 F. Supp. 2d 1011 (D. Mont. 2012) ................................................................. 3

*Colo. Envtl. Coal. v. Off. of Legacy Mgt.*,
    08-CV-1624-WJM-MJW, 2018 WL 684761 (D. Colo. Feb. 2, 2018) .......... 2, 3, 9

*Conservation Cong. v. U.S. Forest Serv.*,
    2:13-CV-01977-JAM-DB, 2018 WL 1142199 (E.D. Cal. Mar. 2, 2018)......... 3, 22

*Constr. Equip. Co. v. Powerscreen Int'l Distrib., Ltd.*,
    96-CV-1574-AC, 2009 WL 437703 (D. Or. Feb. 19, 2009) .............................. 6

*Crutchfield v. U.S. Army Corps of Eng'r*,
    175 F. Supp. 2d 835 (E.D. Va. 2001) ................................................................. 3

*Haight v. U.S. Dept. of Agric.-Rural Dev.*,
    1:17-CV-00014-CL, 2017 WL 2416361 (D. Or. Apr. 28, 2017), *report and
    recommendation adopted*, 2017 WL 2415916 (D. Or. June 1, 2017) ................. 6

*Idaho Watersheds Project v. Hahn*,
    307 F.3d 815, 833–34 (9th Cir. 2002) ............................................................... 12

*In re Murchison*,
    349 U.S. 133 (1955).............................................................................................. 4

*Moon v. GMAC Mortg. Corp.*,
    No. C08–969Z, 2008 WL 4741492 (W.D. Wash. Oct. 24, 2008) ................... 2, 7

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
    No. 3:01-CV-00640-SI, 2015 WL 423090, (D. Or. Feb. 2, 2015) ..................... 12

*Pub. Serv. Co. of Colo. v. Batt*,
    67 F.3d 234 (9th Cir. 1995) ................................................................................ 2

*Sharp v. Weston*,
    233 F.3d 1166 (9th Cir. 2000) ..................................................................... 2, 4, 7

*Sierra Club v. Penfold*,
    857 F.2d 1307 (9th Cir. 1988) ............................................................................ 2

*Swan View Coal. v. Barbouletos*,
    639 F. Supp. 2d 1187 (D. Mont. 2009) ............................................................... 4

*Swan View Coal. v. Barbouletos*,
    CV 06-73-M-DWM, 2010 WL 11530904 (D. Mont. Jan. 27, 2010) .... 3, 4, 22, 23

*United States v. Swift & Co*.,
    286 U.S. 106 (1932) ............................................................... 2

*W. Watersheds Project v. U.S. Forest Serv.,*
    2017 WL 5571574 (D. Idaho, Nov. 20, 2017) .................................. 21

**Rules:**

Fed. R. Civ. P. 60 ................................................................. 2, 4,  5

## I.  INTRODUCTION

Defendants have filed a motion to dissolve the Court's injunction in this matter on the eve of the grazing season, and hope to obtain a ruling in less than one month.  Defendants think the mere issuance of new decisions that govern grazing management for the Chemult Pasture— namely a new biological opinion, environmental impact statement (EIS), record of decision (ROD), and grazing permit—satisfies this Court's injunction.  But courts reject such arguments that would render injunctions toothless.  Instead of blessing pro forma responses to an injunction, courts look closely and carefully at whether the substance of an agency's new decision satisfies an existing injunction when determining whether to dissolve the injunction.   The hard look required for the court's review here demands briefing from both parties and oral argument, and the opportunity for review by Judge Aiken, making a June 25 ruling unrealistic.

Defendants' motion asserts that its new decisions remedy the prior legal violations, but this bald assertion without explanation does not satisfy Defendants' burden here to show that the grazing authorized for 2018 complies with the Court's injunction.  In contrast, the record shows that the Forest Service has not demonstrated the 2018 grazing satisfies the terms of the injunction, including maintaining viability of sensitive species populations on the allotment.  In fact, the Forest Service is opening more sensitive species habitat on the Chemult Pasture to livestock grazing compared to prior years and has not demonstrated that its mitigation measures to alleviate damage to fens and Oregon spotted frogs will be effective.  Because the Forest Service has not corrected the legal deficiencies regarding grazing impacts on populations of sensitive plants and Oregon spotted frog that formed the basis of the Court's injunction, this Court should deny Defendants' motion to dissolve the injunction.

## II.    LEGAL BACKGROUND

Courts retain jurisdiction over their injunctions even in the absence of an express statement to that effect. *United States v. Swift & Co.*, 286 U.S. 106, 114 (1932). Rule 60 empowers courts—not the parties themselves—to modify or dissolve an injunction where a party makes a motion "within a reasonable time." Fed. R. Civ. P. 60(b), (c)(1). The moving party "bears the burden of establishing that a significant change in facts or law warrants revision or dissolution of the injunction." *Sharp v. Weston*, 233 F.3d 1166, 1170 (9th Cir. 2000). "A significant change is one that pertains to the underlying reasons for the injunction." *Moon v. GMAC Mortg. Corp.*, No. C08–969Z, 2008 WL 4741492, at *2 (W.D. Wash. Oct. 24, 2008).

In Administrative Procedure Act (APA) cases, a court may retain jurisdiction to ensure a new agency action corrects legal deficiencies that gave rise to an injunction over a prior agency action. *Sierra Club v. Penfold*, 857 F.2d 1307, 1321-22 (9th Cir. 1988) (rejecting agency argument that an injunction is dissolved upon completion of a new agency action and upholding a district court's retention of jurisdiction to review the adequacy of a new agency action). Without doing so, the government could end an injunction by merely publishing, "any" new action and record of decision, "however flawed," and thereby render an injunction "toothless." *Pub. Serv. Co. of Colo. v. Batt*, 67 F.3d 234, 237 (9th Cir. 1995).

When determining whether new agency actions comply with an injunction, courts take a hard look at the new actions under the APA and afford the non-moving party a full opportunity to be heard. *Colo. Envtl. Coal. v. Off. of Legacy Mgt.*, 08-CV-1624-WJM-MJW, 2018 WL 684761, at *1 (D. Colo. Feb. 2, 2018) (considering motion to dissolve injunction based on "a new administrative record and new briefing, but with the burden of persuasion placed on" the agency, after denying motion to dissolve the injunction solely because agency "had generated all

of the needed environmental review documents and touched upon all of the subjects missing from its previous round of documents"); *Conservation Cong. v. U.S. Forest Serv.*, 2:13-CV-01977-JAM-DB, 2018 WL 1142199, at *1 n.1, 4-5, 9 (E.D. Cal. Mar. 2, 2018) (holding hearing and considering whether substance of new agency action complied with injunction requiring agency to "cure the noted defects" in court order); *All. for the Wild Rockies v. Bradford*, 864 F. Supp. 2d 1011, 1018–1022 (D. Mont. 2012) (determining whether new analysis complied with law) *amended in part*, 2012 WL 12892360 (D. Mont. July 23, 2012); *Swan View Coal. v. Barbouletos*, CV 06-73-M-DWM, 2010 WL 11530904, at *1, 3, 5 (D. Mont. Jan. 27, 2010) (holding that it was "necessary to substantively review the new [agency action] for compliance with the [law]" after "holding that the completion of the new biological opinion does not automatically lift the injunction"). A defendant simply declaring that a new agency action satisfies an injunction is not sufficient to dissolve it.

Where the agency's action does not correct the legal deficiencies found by a court, the court will leave the injunction in place. *See, e.g.*, *Colo. Envtl. Coal.*, 2018 WL 684761, at *1, 19 (keeping injunction in place where an agency's new actions "mostly pass[ed] muster" but included one "remaining flaw" regarding consultation under the Endangered Species Act); *Crutchfield v. U.S. Army Corps of Eng's*, 175 F. Supp. 2d 835, 849 (E.D. Va. 2001) (refusing to dissolve injunction over Army Corps' authorization of project despite removal of most environmentally-harmful aspects of project). However, a court's review should be limited to the reasons underlying the previous injunction. *Conservation Cong.*, 2018 WL 1142199, at *2 (citing *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 162 (2010)).

**III.    THE FOREST SERVICE LACKS AUTHORITY TO UNILATERALLY DECLARE THE INJUNCTION IS NO LONGER IN EFFECT.**

Defendants brazenly declare, "that the injunction is no longer in effect for livestock grazing on Chemult Pasture." ECF # 136 at 2. In so doing, Defendants seek to evade the fundamental legal principle that "no man can be a judge in his own case." *In re Murchison*, 349 U.S. 133, 136 (1955). They provide no authority for the argument that they may simply provide "notice of compliance" to demonstrate an injunction is ineffective. Rule 60(b) and numerous cases demonstrate the opposite—an enjoined party must affirmatively move to dissolve an injunction and allow the non-moving party and the court an opportunity to fully review the action for compliance with an injunction. *See infra* at 2-3 (collecting APA cases requiring full briefing and review of new agency actions); *Sharp*, 233 F.3d at 1170 (explaining district court "was *required* to examine the existing situation … to determine whether the changes … were so significant as to warrant" dissolution on an injunction) (emphasis added). Moreover, this Court intended to "retain jurisdiction to supervise compliance" with the injunction. ECF # 105 at 31 (recommending retention of jurisdiction); ECF # 115 (adopting F&Rs in full).

In rejecting a similar argument advanced by the government—that an injunction automatically dissolves with issuance of new actions—the District of Montana aptly explained:

> Because the Court retains jurisdiction over an injunction, Defendants' unilateral declaration that they complied with the Court's Order and therefore the injunction was automatically dissolved has no legal force other than constituting a violation of law for which the appropriate remedy is criminal contempt proceedings.

*Swan View Coal. v. Barbouletos*, 639 F. Supp. 2d 1187, 1190 (D. Mont. 2009); *Swan View Coal.*, 2010 WL 11530904, at *5 (explaining that the court rejected "Defendants' unilateral contention that issuance of *any* new [agency action] warrants the dissolution of the injunction" because that would render the injunction "toothless") (emphasis in original). Here, the Court

should similarly reject Defendants' improper "notice of compliance" that would deprive Plaintiffs of their right to ensure the new actions correct previous legal violations and comply with this Court's injunction.  If the agencies want the injunction dissolved, they must proceed through a Rule 60(b) motion that allows for a full response by Plaintiffs and review by the Court.

## IV.    PLAINTIFFS OPPOSE DEFENDANTS' REQUEST FOR EXPEDITED CONSIDERATION AND RULING ON THEIR MOTION.

Defendants ask this Court for a ruling by June 25, 2018 because the grazing season for the Chemult Pasture is scheduled to begin on July 1, 2018.  The agencies' timing dilemma is of their own making and should not be used to prejudice Plaintiffs or this Court.

Defendants waited until May 31, 2018 to file a motion to dissolve the injunction, giving the Court less than one month to rule.  The agencies waited to complete the new biological opinion and sign the ROD until May 21, 2018 and May 25, 2018, respectively, despite knowing since January 2017 that the agencies must meet the terms of the injunction and issue a new biological opinion before authorizing grazing again.  ECF # 115.  Plaintiffs' counsel contacted Defendants' counsel several times this winter and spring to inquire about the status of these decisions and give notice that Plaintiffs were concerned about potential grazing on the Chemult Pasture in 2018 and the need for court review.  Despite ample notice, Defendants choose not to provide Plaintiffs or this Court with adequate time to determine whether new decisions complied with the terms of the injunction.  By waiting until the eve of grazing to issue the new biological opinion and ROD and file this motion, Defendants have created this timing problem, which does not justify expedited review.

Indeed, as Plaintiffs demonstrate below, ruling on this motion is not a simple matter.  The Court must determine whether the substance of Defendants' new decisions remedies the legal deficiencies that formed the basis of the Court's injunction, which requires review of multiple

issues and a number of agency documents.  Given Defendants' perfunctory motion, Plaintiffs

suspect that Defendants may improperly introduce new facts and new arguments in their reply

brief to counter Plaintiffs' arguments below, which will necessitate a request by Plaintiffs to file

a sur-reply to address the improper new information.  Plaintiffs are also requesting an oral

argument once the briefing is complete.  Thus, it is virtually impossible for this Court to issue a

ruling on this motion by June 25, 2018.

Moreover, any recommendation issued by this Court with regard to Defendants' motion

must be reviewed by an Article III judge, just as this Court's prior Report and Recommendation

was reviewed by Judge Aiken.  ECF # 115.  In Oregon, when a Magistrate Judge considers Rule

60 motions, the parties must be afforded the opportunity to seek review from the Article III

Judge if all parties have not consented.  *Haight v. U.S. Dept. of Agric.-Rural Dev.*, 1:17-CV-

00014-CL, 2017 WL 2416361, at *1-3 (D. Or. Apr. 28, 2017), *report and recommendation

adopted*, 2017 WL 2415916 (D. Or. June 1, 2017); *Constr. Equip. Co. v. Powerscreen Int'l

Distrib., Ltd.*, 96-CV-1574-AC, 2009 WL 437703, at *1, 7 (D. Or. Feb. 19, 2009).  Accordingly,

that process will certainly extend beyond the start of the grazing season.

In order to properly and sufficiently provide Plaintiffs and the Court time to fully brief

and consider this motion through oral argument and review by Judge Aiken, Defendants' request

for expedited review must be denied.  Such a denial is necessary to prevent Defendants from

circumventing a full and fair review by electing to issue new decisions on the eve of grazing.

## V.    DEFENDANTS HAVE NOT DEMONSTRATED THAT THE COURT SHOULD DISSOLVE THE INJUNCTION.

To meet their burden, Defendants cannot rely solely on the issuance of new decisions that

change some details about grazing on the Chemult Pasture and open up new sensitive areas to

grazing.  They must show that the new decisions are not just new or different, but instead

represent a "significant change" from the legal deficiencies in the prior decisions that gave rise to the injunction. *See Sharp*, 233 F.3d at 1170; *Moon*, 2008 WL 4741492, at *2 ("A significant change is one that pertains to the underlying reasons for the injunction."). Because the agencies' new decisions carry forward the same substantive flaws as the previous ones, the Court should continue the injunction.

> ### A. The Forest Service Has Not Shown That Its Authorization of Grazing In 2018 Complies With The National Forest Management Act Injunction.

After finding that Defendant Forest Service had violated the National Forest Management Act (NFMA) by failing to manage grazing in a way that ensured maintenance of viable populations of sensitive species, the Court issued an injunction to remedy that legal violation. ECF # 105; ECF # 115. It prohibited the Forest Service from issuing annual authorizations permitting grazing in the Chemult Pasture unless and until the authorization accurately reflects the actual levels of grazing in the pasture—including cattle trespass and overgrazing—and accurately reflects the impacts of that level of grazing on the sensitive species in the relevant areas. ECF # 105 at 30-31; ECF # 115 at 3-4. The injunction further required the Forest Service to demonstrate that the authorized grazing does not violate the agency's requirement to maintain the viability of sensitive species populations in range. *Id*. The Forest Service has not demonstrated in its motion that it has met these requirements.

> ### 1. Defendants' reliance on the new EIS and ROD to demonstrate that 2018 grazing satisfies the injunction is unreasonable.

At the outset, Plaintiffs want to make clear that, although they believe there are numerous flaws with the new EIS, ROD, and biological opinion, at issue here is whether the grazing planned for 2018 meets the terms of the injunction. The first relevant question is whether the 2018 authorization accurately reflects the level of grazing that will occur and the impacts of that

grazing.  The answer to that question is no.  Rather than clarifying actual levels of current grazing as required, Defendants' new decisions provide confusing and contradictory information and insufficient detail about what grazing will actually occur in 2018.  *See* ECF # 105 at 18 (explaining that the agency's decisions "must accurately reflect *actual* current grazing to properly indicate the adverse effects of such grazing on the sensitive species populations in the Antelope Allotment") (emphasis in original).

Defendant Forest Service has submitted the ROD (Ex. C), new allotment management plan (AMP) (Ex. D), new permit (Ex. E), and 2018 grazing bill (Ex. F) as exhibits in support of its motion.  The agency does not intend to issue any further annual authorization document for 2018 grazing.  Def. Motion at 8; ROD at 20.  The permit and bill specify only the number of cattle that can graze the Antelope Allotment as a whole and the overall season of use.  Def. Exs. E, F.  The AMP has a bit more information, showing the number of cattle and season of use for each pasture as well as the grazing system.  AMP at 3.

For instance, for the Chemult Pasture, the AMP shows 275 cow/calf pairs can graze July 1 to September 30 under a deferred rotation system[1] via the term permit, and 219 cow/calf pairs can graze July 1 to September 30 under a deferred rotation system via a private land permit.  *Id.* For the Jack Creek Unit (the area previously closed behind the frog fence), 75 cow/calf pairs can graze from July 1 to September 30 under a "moderate intensity" system[2].  *Id.*  For five fenced meadows within the Chemult Pasture that were previously closed to grazing but will now be open, the AMP notes that there will be a "variable" number of cow/calf pairs which can graze from July 1 to September 30 under a moderate intensity system.  *Id.*  Finally, the AMP shows

---

[1] Deferred rotation differs the timing of grazing year to year so that the forage is at a different stage of growth when grazing occurs each year.  AMP at 4.
[2] Moderate intensity grazing means using a 35% utilization standard.  Plfs. Ex. 1 (BA) at 20.

that the North Sheep Pasture will also be re-opened after more than a decade of non-use, and 494

cow/calf pairs can graze from July 1 to September 30 under a deferred rotation system.  *Id.*

While the AMP provides these broad schedules, it omits key details about expected annual

variations in grazing levels, timing, and locations.

The agencies' documents admit that specific details of grazing management will change

from year to year.  But instead of disclosing and considering the actual levels of grazing and

impacts that will occur in a given year, the Forest Service intends to change grazing through

future annual authorizations.  For instance, the setting of the deferred rotation schedule and other

adjustments based on current year conditions "would be reflected in annual authorizations."

AMP at 4; Plfs. Ex. 1 (BA) at 20-21; Plfs. Ex. 2 (BiOp) at 7.[3]  Furthermore, the permit and AMP

allow for grazing in the Jack Creek Unit from July 1 to September 30, but elsewhere the AMP

states that grazing in these pastures will likely be for a maximum of one month and that the

location and duration may vary over time.  AMP at 3, 4.  Thus, use of the Jack Creek Unit

pastures "will be directed by annual authorizations and may be adjusted yearly based on

monitoring."  AMP at 4; BiOp at 8-9; *see also* AMP at 10 (grazing within Jack Creek Unit would

vary . . . and appropriate grazing levels would be identified each grazing season through pre-

season monitoring).  Indeed, monitoring and adaptive management are a crucial component of

Defendants' decisions, and changes to the management of the allotment to address findings from

the monitoring "are implemented through the [AOI] or Direction Letter."  BiOp at 8.  These

---

[3] Plaintiffs are submitting additional agency documents received from Defendants' counsel or
through Freedom of Information Act requests because Defendants have only provided a few
exhibits with their motion.  The Court's ruling on Defendants' motion will be based on review of
the administrative record for the new agency actions.  *See Colo. Envtl. Coal.*, 2018 WL 684761,
at *1 (D. Colo. Feb. 2, 2018) (considering motion to dissolve injunction based on "a new
administrative record and new briefing").  Because Plaintiffs' exhibits are part of the record for
Defendants' new decisions, the Court may consider them.

adjustments to the grazing system and number of livestock implemented through the annual

authorizations "will minimize impacts to fens, wet meadows, and sensitive species habitat."

AMP at 4.

The ROD itself states that the deferred rotation system would control timing and intensity

of grazing in fen and riparian units of the Chemult Pasture, and the routing of livestock will

change each year, which will help protect resource values.  ROD at 8-10.  In particular, the ROD

noted that sensitive plant and Oregon spotted frog habitat would be better protected than in the

past due, in part, to the deferred rotation and controlled grazing strategy that would vary grazing

levels between years in response to annual variations in habitat conditions.  ROD at 14-15.

Attachment one of the ROD describes the selected grazing scheme, but still does not provide

details about the grazing that will occur each year—particularly in 2018; it simply states that

Chemult and North Sheep pastures will utilize a deferred rotation system, and the six fenced

riparian areas that will now be open (including Jack Creek) will have "some level of grazing,

either for holding or as part of the rotational grazing system."  Plfs. Ex. 3 at 1.

Despite the lack of specific information about 2018 grazing in the ROD and AMP, and

the Defendants' reliance on annual authorizations to make key changes to grazing each year, the

Forest Service has not and will not issue any annual authorization for grazing this year.  This

makes it impossible for Plaintiffs and the Court to determine exactly what grazing will occur in

the various pastures in 2018 or in any given year.  The grazing bill authorizes 206 cows and 206

calves to graze the allotment as a whole, but the agency has provided no information about how

many cattle will graze the Jack Creek Unit, where they will graze, and for how long, and the

same is true for the other fenced riparian areas.  Def. Ex. F.  No information has been provided

as to what rotation the agency will use for the Chemult Pasture this year, and whether it will

make any adjustments based on the high level of bank alteration (40%) found at the Chemult Pasture monitoring site in 2016—the last season the Chemult Pasture was grazed. *Id.;* BiOp at 32. This lack of detail is unreasonable given this Court's holding that the agency must specify actual levels and impacts of grazing. *See* ECF # 105 at 30-31.

These details are especially important for 2018 because it is unclear what areas will even be available for grazing this summer given the infrastructure requirements established by the ROD and AMP. Many miles of fence construction, reconstruction, and maintenance are required by the ROD and AMP for implementation of the new grazing scheme. ROD at 3, 15; AMP at 19-20; EIS at 2-13, 2-17. Up to fourteen miles of fence must be constructed on the west and south sides of the North Sheep pasture, and at least the initial sections of this fencing must be constructed before grazing is authorized on that pasture. AMP at 20; EIS at 2-13, 2-17. Many miles of fence between the North Sheep and Chemult pastures and between the Chemult and Tobin Cabin pastures must be reconstructed as well. EIS at 2-13, 2-17; AMP at 19. A fence separating Jack Creek pastures 1 and 2 must be constructed before pasture 1 can be grazed because grazing cannot occur in pasture 2 until Oregon spotted frog restoration work is completed there. AMP at 4. Numerous fen protection fences are required to be built or maintained, including a fence around the Little Parker fen. ROD at 15; AMP at 20.

The Forest Service has not demonstrated that this fencing work has been completed, and a recent site visit by Plaintiffs verified much or all of the work remains to be done, including the new fencing required along the west side of the North Sheep pasture, the fence separating Jack Creek pastures 1 and 2, and reconstruction of fencing between North Sheep, Chemult, and Tobin

Cabin pastures.  Third Declaration of Theresa Simpson ¶¶ 4-9  (filed herewith).[4]  Additionally, numerous water developments on the Chemult Pasture require repair or maintenance to restore them to working condition.  *Id.* ¶¶ 10-13.  Fencing and water development conditions this year are worse than normal because no grazing occurred in 2017, and thus it has been two years since maintenance was done, with an intervening winter that caused significant damage.  *Id.* ¶ 13.

Given the time and resources needed to complete all of this work, it is unclear where grazing will occur in 2018.  Because of the agencies' heavy reliance on grazing the Chemult Pasture, North Sheep pasture, Jack Creek pastures, and fenced meadow areas under a deferred rotation system, as well as use of water developments, to improve livestock distribution and reduce the impacts to fens and Oregon spotted frog habitat, the failure to complete these infrastructure tasks undercuts the agencies' claim that the 2018 grazing complies with the injunction.  *See* AMP at 3-4, 19-21; ROD at 9, 12, 14-16; EIS at 2-12 to 2-13; Botany BE (Def. Ex. A) at 40; BA at 50-56.

In sum, the Forest Service issued decisions to open up additional sensitive areas to grazing *before* disclosing and evaluating key details about its plans and ensuring infrastructure is in place to manage and mitigate the impacts of grazing in 2018.  Although less unauthorized use may occur in 2018 because previously closed areas may be open to use, the lack of detail about the actual grazing authorized for 2018 obscures, rather than clarifies, the levels and impacts of

---

[4] The Court should consider Ms. Simpson's declaration because it includes information the Defendants should have considered, but did not.  *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, No. 3:01-CV-00640-SI, 2015 WL 423090, at *1, 3-5 (D. Or. Feb. 2, 2015) ("NWF") (admitting expert declarations in a BiOp challenge to identify factors the agency did not consider or to explain complex scientific or technical information).  Further, the declaration demonstrates harm is likely to occur to fens and frogs in 2018, unless the Court denies the motion to dissolve the injunction, and thus is permissible when considering remedial issues related to the injunction. ECF # 105 at 31 (agreeing with Defendants' concession that Ms. Simpson's declaration was permissible for remedy); *Idaho Watersheds Project v. Hahn*, 307 F.3d 815, 833–34 (9th Cir. 2002) (reviewing extra-record declaration when considering injunction).

grazing that will occur in 2018.  Accordingly, the Forest Service had not complied with the injunction requirement that its 2018 authorization accurately reflects the actual levels of grazing that will occur and the impacts of that grazing on sensitive species.  *See* ECF # 105 at 30-31.

> **2.**    **The record shows that the Forest Service has not ensured its grazing management will maintain viable populations of sensitive plants.**

Defendants also have not demonstrated that the 2018 grazing will maintain viable populations of sensitive plants in the area.  *See* ECF # 115 at 3-4; ECF # 105 at 31 (imposing injunction that required agency "to demonstrate that grazing does not violate" its duties "to maintain the viability of sensitive species populations…").

Monitoring shows that grazing has continued to damage fens that provide habitat for these plants.  A report prepared by the forest botanist discussed the ten high value fens monitored in 2015 and 2016, and noted:

> Soil disturbance thresholds have been exceeded in several of the high-value fens .
> . . . In particular, bare ground primarily associated with livestock trampling
> disturbances has been well above 10% in Johnson East, Little Parker, two distinct
> sites in Upper Jamison, and one site outside a fenced exclosure in Upper Jack
> Creek . . . . [C]onditions of the above five sites have exceeded desired conditions
> and bare ground thresholds for at least the past three years.  The level of bare
> ground increased among all five sites between 2015 and 2016.

Plfs. Ex. 4 at 4-5.  The Little Parker fen had the most bare ground of all monitored fens, reaching almost 50%.  *Id.* at 2-3.  In contrast, an area that was fenced in 2015 showed a decrease in bare ground from 2015 to 2016, and fens that receive little or no livestock use had minimal levels of bare ground.  *Id.* at 5, 7.  The report noted that fens and wet to dry meadows produce the vast majority of forage for livestock in the Chemult Pasture and therefore experience a disproportionate level of grazing use.  *Id.* at 11.

The Forest Service picked these monitoring sites several years ago because of their high ecological value, and set a goal of maintaining or improving conditions.  *Id.*  However, as seen

from the monitoring data, "[p]asture management has not been successful in effectively limiting the distribution of livestock and excessive disturbances in the five fens consistently exceeding soil disturbance thresholds. . . ." *Id.* The saturated condition of these high value fens "assures that even low to moderate livestock use will result in moderate to high levels of bare ground that require extended periods of non-use to recover" and even light grazing levels in degraded fens results in the persistence of degraded conditions. *Id.*; *see also* Botany BE at 49. In 2017, when the Chemult Pasture was not grazed, monitoring showed that bare ground went down significantly at the problematic sites, although most still remained above the 10% threshold, showing that completely removing livestock improved conditions, but full recovery takes extended time. Plfs. Ex. 5 (fen monitoring results, comparing 2016 to 2017: Johnson East 25% to 13%, Little Parker 48% to 36%, North Jack 3 14% to 4%, Upper Jameson 20% to 14.7%).

In 2018, not only will cattle again graze most of these high value fens, but the new grazing scheme under the ROD and AMP opens even more fens to grazing use by opening the Jack Creek Unit and five riparian exclosures. AMP at 3; Botany BE at 40, 49; EIS at 3-48 (stating that fen habitat open to grazing would increase from 376 acres to 515 acres). Thus, fens that had been closed to grazing can now be authorized for use and subjected to many more cattle impacts. Forest specialists noted that fens in the smaller re-opened riparian exclosures will likely experience excessive trampling, and recommended fencing them or not opening them at all. Plfs. Ex. 4 at 12; Plfs. Ex. 6; EIS at 3-49. The Botany BE and EIS noted that conditions in the six riparian exclosures that are re-opened to grazing will likely decrease in condition. Botany BE at 49; EIS at 3-49, 3-67. Despite these findings that past grazing and management failed to adequately protect fens, and that new grazing will degrade fen conditions, the agency decided to allow new and continued grazing of fens.

To justify this decision, the agency arbitrarily relies on better distribution of livestock, building a fence around Little Parker fen, and monitoring and adaptive management to protect the fens and sensitive plants.  Botany BE at 45-49; EIS at 3-48.  The Forest Service has not provided any evidence that the required North Sheep and Little Parker fences have been or will be built, and Plaintiffs' observations indicate they have not.  Third Simpson Decl. ¶¶ 4-9.  Thus, livestock use will still be concentrated on the Chemult Pasture, and the highly degraded Little Parker fen will still be accessible to cattle.  Furthermore, the Botany BE and EIS admitted that improved distribution may not help much because even light to moderate grazing has caused excessive bare ground in fens, and light use in already degraded fens can perpetuate degraded conditions, so a "reduction in AUMs for the Chemult Pasture will not ensure Good conditions." Botany BE at 49, EIS at 3-49.  Indeed, five of the ten high value fens are already below "Good" condition, and eight of the ten will now be open to livestock.  Botany BE at 49; EIS at 3-48 to 3-49.  The already existing low water conditions makes it even more likely that cattle will congregate in fens in 2018.  Third Simpson Decl. ¶¶ 14-17 (discussing low water conditions on pasture).

The monitoring and adaptive management plan also will not ensure protection of fens and sensitive plants in 2018.  The threshold for Good condition is less than 10% bare ground or soil disturbance.  EIS at 3-48.  The monitoring that is identified in the AMP shows that the annual standards used for monitoring the high value fens and the newly opened riparian exclosures are 6" stubble height and 20% alteration.  AMP at 16.  It is not clear what the 20% alteration standard measures, or why the standard is 20% alteration if the goal is to have less than 10% bare ground or soil disturbance.  Presumably a fen could have 18% alteration in 2018 and not be subjected to any change in grazing management the following year.  And if the 20% alteration

standard is exceeded in 2018 at a particular fen, that fen can still be grazed the following year, it just will require more herding to decrease disturbance. AMP at 17.

Reliance on this standard to protect fens is further undercut by the fact that the Forest Service may not even do the monitoring. The AMP states that, for the fen alteration monitoring, "[a]lthough the Forest Service will make every effort to assist the permittee in ensuring compliance with the standards, the permittee has the ultimate responsibility for ensuring that the alteration standards are met." AMP at 15. Given the long history of noncompliance problems on this pasture, it is unreasonable to rely on the permittee to ensure compliance with the fen alteration standard. *See* ECF # 88 at 8-9. And while it appears that the long-term monitoring of fens will be conducted by the Forest Service and apply the 10% bare ground standard, that monitoring is only required every one to five years, and therefore may not occur in 2018. AMP at 15, 17. Moreover, any violation of the 10% bare ground standard leads only to more restrictive use standards the following year for that fen and thus grazing can continue to occur there. AMP at 18. As noted above, even light use of degraded fens perpetuates the degraded condition. Plfs. Ex. 4 at 11; Botany BE at 49. In light of the repeated violations of the 10% bare ground standard in several of the high value fens for several years, the Forest Service's monitoring and adaptive management approach has not succeeded at protecting fens and sensitive plants. Plfs. Ex. 4. Thus, the Forest Service's reliance on mitigation measures is unreasonable because fences, distribution plans, adaptive management, and monitoring, are uncertain to occur, or will not protect fens and sensitive plants during the 2018 grazing season.

Finally, the Forest Service's conclusions about viability of sensitive plant populations contain the same flaws Plaintiffs noted in the prior case. *See* ECF # 105 at 16. The Botany BE explains that grazing on the Chemult Pasture would affect at least four sensitive plants: *Carex*

*capitata, Carex lasiocarpa* var. *Americana, Utricularia minor,* and *Pseudocalliergon trifarium.*

Botany BE at 45-48, 72-75.  It admits that adverse effects to these plants could occur in the

newly opened riparian exclosures, but that conditions could potentially improve in other fens due

to improved distribution of livestock, building the Little Parker fence, and monitoring and

adaptive management.  *Id.*[5]

Then, in its conclusions for these species, the Forest Service stated that the grazing under

alternative 3, which was largely adopted as the proposed grazing in the ROD, may impact

individuals or habitat of each species but is not likely to cause a loss of viability of the

population.  *Id.* at 72-75; EIS at 3-70 to 3-73.  Like in the prior case, the BE contains no

discussion about the current size of these populations, what constitutes a viable population, or the

extent of habitat needed to support a viable population.  *Id.*  Thus, there is still no information to

determine how impacts to plants or their habitat would affect the viability of populations for each

species.

For these reasons, Defendants have not demonstrated that the grazing in 2018 will ensure

maintenance of viable populations of sensitive plants, and "not contribute to a negative trend in

viability" as required by the Court.  *See* ECF # 105 at 19.

> ### 3.   The record shows that the Forest Service has not ensured its grazing management will maintain viable populations of Oregon spotted frog.

Defendants also have not shown that the grazing planned for 2018 will maintain a viable

population of Oregon spotted frogs, as required under this Court's injunction.  *See* ECF # 105 at

19, 30-31 (requiring agency to demonstrate grazing does not violate requirement to maintain

viable populations).  Instead, the agencies' decisions carry forward existing problems, rely on

---

[5] There is a significant question as to whether improvement in conditions would occur in 2018 to offset the harm in newly opened fens due to the lack of required fencing and problems with adaptive management noted above. *Supra* pp. 14-16.

uncertain or ineffective management measures, and allow grazing to harm additional frog habitat.

The ROD allows the Forest Service to open the Jack Creek Unit to grazing, thus the portion of Jack Creek that previously was excluded from grazing will now see increased use. AMP at 4.  The unit will be divided into four pastures but only pastures 1 and 4 can be grazed until restoration actions in pastures 2 and 3 are completed; so far no fence exists to separate pastures 1 and 2.  *Id.* at 4-5; Third Simpson Decl. ¶ 9.  As noted above, the Forest Service has not identified where grazing would occur within the Jack Creek Unit this year, at what levels, and for what duration.  Similar questions and concerns about the timing and location of pasture rotation and fence construction were raised during the consultation process, but the final decision did not resolve all of these uncertainties.  *See* Plfs. Ex. 7 at 19-21, 24  (asking about the location and timing of grazing and fence construction and explaining that such differences "can mean different things for the effects analysis, especially given the importance [of] the habitat in this particular stretch of Jack Creek");[6] Plfs. Ex. 1 (BA) at 17-20, 24.

As with the fens, Defendants rely on improved distribution of livestock and monitoring/adaptive management to limit impacts to Jack Creek.  EIS at 3-94; BA at 46-47.  Yet, the extent of distribution that may occur in 2018 is unclear due to the fence construction and reconstruction requirements that may limit use of some areas this year.  AMP at 20; EIS at 2-13, 2-17.  The agencies also rely on annual grazing standards of 35% utilization and 20% bank alteration, AMP at 16; BiOp at 35-36, which raise the same problems discussed in the prior case:

---

[6] Plaintiffs just obtained documents under the Freedom of Information Act that shed light on these and other issues underlying the injunction, including the FWS's comments on the Forest Service's draft BAs.  *See* Plfs. Ex. 7.  This underscores that Defendants' motion for an abbreviated and expedited review prevents the Court from reviewing all relevant documents to determine whether the Defendants have complied with the injunction.

they are general riparian standards that do not account for localized impacts to key frog habitat

and are not tied to Oregon spotted frog life history and habitat needs.  *See* ECF # 88 at 26-28

(Plaintiffs' opening brief); ECF # 105 at 29 (Court R&R).   For instance, even a small number of

cattle can damage important pools quickly, such as when small numbers of trespass cattle caused

damage to intermittent pools occupied by frogs.  *See* ECF # 88 at 27; ECF # 98 at 18-19

(discussing damage to frog pools from trespass cattle).  The low water levels recently observed

on the allotment heighten the concern that even light use by cattle in 2018 may adversely affect

diminishing spotted frog pools.  Third Simpson Decl. ¶¶ 14-17.

The Forest Service also has not shown that these annual standards will adequately protect

frogs because it has not identified the location of monitoring sites, stating only that monitoring

locations have been designated within each pasture that has spotted frog habitat.  BA at 21; AMP

at 14-15.  Long stretches of Jack Creek occur in each pasture, and it is unknown how many sites

will be monitored and what spotted frog habitat features are associated with each site.  BA at 22

(showing 48 acres of frog habitat in Chemult Pasture and 94 acres of habitat in Jack Creek

Pasture 4—the two pastures most likely to be used in 2018).

Additionally, the Forest Service's annual monitoring plan in the AMP does not specify

how often each site must be monitored, and in fact, does not even require the Forest Service

itself to conduct the monitoring, stating that "[a]lthough the Forest Service will make every

effort to assist the permittee in ensuring compliance with the standards, the permittee has the

ultimate responsibility for ensuring that the . . . standards are met."  AMP at 14-15 (applying

same language for allowable use monitoring, stubble height monitoring, and bank alteration

monitoring).  Thus, there is no guarantee the monitoring will occur, or occur often enough to

prevent violations of the standards, or will even be done correctly.  Similarly, informal

inspections by the Forest Service "will be made as the opportunity arises," and formal inspections "will be held as possible with an attempt made to include each of the major pastures."  AMP at 14.

A similar problem exists for the part of the adaptive management plan aimed at protecting frogs during low water conditions.  Defendants recognize that potential harm to spotted frogs increases when water levels in Jack Creek drop, as cattle and frogs congregate at the same remnant pools.  BiOp at 44.  To address this, the adaptive management plan calls for preventing access to Jack Creek by closing pasture gates or installing temporary fencing when the perennial waters in the creek become intermittent, or when Pool D in the intermittent portion of the creek drops below 1.5 feet.  *Id.* at 46; AMP at 18-19.  If closing gates or installing temporary fencing does not prevent livestock access to the creek, the livestock will be removed from the pasture.  AMP at 18-19.

Again, these provisions do not specify who will do the monitoring of water levels or how often, and how often someone must check whether cattle are still accessing the creek after low water levels trigger removal.  Instead, the plan simply states, "[i]f field visits indicate that water levels" have dropped and "if livestock continue to access the creek then . . . ."  *Id.*  Given that water levels in Jack Creek can drop quickly during dry years, and that cattle frequently trespass behind fences to access Jack Creek, the failure to require this monitoring on a frequent schedule undercuts its effectiveness at protecting frogs during critical low water conditions.  *See* ECF # 88 at 7-9, 25-26 (discussing water levels and trespass).  Such conditions are likely to occur this summer based on current lower-than-normal water levels.  Third Simpson Decl. ¶¶ 14-17.

Defendants themselves admit that, even with the monitoring and adaptive management plans, allowing grazing to occur along Jack Creek will adversely affect Oregon spotted frogs.

BA at 56; BiOp at 45, 47.  FWS discussed harm to frogs from trampling and disturbance by

cattle, acknowledging that the estimated effects are significant.  BiOp at 45.  It concluded that

these effects would still allow Oregon spotted frogs "to persist in the action area," and were "not

expected to occur to an extent that is likely to cause the extirpation of Oregon spotted frogs in the

Jack Creek area . . . ."  BiOp at 45, 47.  Allowing the population to persist and avoid extirpation,

however, is a far cry from maintaining a viable population when the existing population is

already well below a viable size.  A small increase in egg masses from 2016 to 2017 still resulted

in just 31 egg masses documented in 2017, well below the historic numbers of more than 300

egg masses documented in 1999 and 2000.  BiOp at 30.  A significant increase in population size

is necessary to achieve a viable population of spotted frogs in Jack Creek.  By allowing grazing

to further harm this fragile population, the agency has not complied with its duty to ensure

"grazing do[es] not contribute to a negative trend in viability."  ECF # 105 at 19.

The Forest Service tries to shirk this duty by claiming the viability requirement does not

apply here because it is a Forest-wide provision that only applies to Forest-level management.

ROD at 4.  The Forest Service raised this same argument in its objections to the Court's Report

and Recommendation and Judge Aiken already rejected it.  ECF # 110 at 12-15; ECF # 115 at 3.

Another court recently rejected that same argument advanced by the Forest Service, holding that

maintaining viable populations of species across the forest meant maintaining *all* populations

that occurred on the forest, and enjoining livestock grazing that was likely to adversely affect one

of several bighorn sheep populations.  *W. Watersheds Project v. U.S. Forest Serv.,* 1:17-CV-434-

CWD, 2017 WL 5571574, at *12-15 (D. Idaho, Nov. 20, 2017).

The ROD then claimed that it was managing to maintain a viable population of spotted

frog in Jack Creek due primarily to the monitoring and adaptive management plans described in

Plaintiffs' Opposition to Motion to Dissolve Injunction                                    21

the AMP and biological opinion, as well as some habitat restoration actions.  ROD at 4-5.  The flaws with the monitoring plan and adaptive management plan discussed above fail to ensure that they will effectively protect the existing spotted frogs from increased grazing use of Jack Creek, and certainly do not ensure that the Jack Creek population will increase in size.

In conclusion, Defendants have not made the requisite showing to dissolve the NFMA injunction.  Simply pointing to their new decisions is not sufficient.  The Court must undertake a thorough assessment of whether the grazing planned for 2018 meets the substantive terms of its injunction.  *See Swan View Coal.*, 2010 WL 11530904, at *5 (explaining the new agency action "is not shielded from a 'thorough, probing, in-depth review'" when deciding whether to dissolve injunction (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971)).  To dissolve this injunction, the Forest Service must provide "a reasoned, clear, and thorough analysis for its conclusions" that address the underlying legal deficiencies which formed the basis of the injunction.  *See Conservation Cong. v. U.S. Forest Serv.*, 2018 WL 1142199, at *9.  The lack of detail and certainty about the grazing authorized for 2018, combined with unreasonable reliance on distribution of cattle, monitoring, and adaptive management plans to protect populations of sensitive plants and the Oregon spotted frog, do not satisfy Defendants' burden to dissolve this injunction.

### B.    Defendants Have Not Demonstrated The New Biological Opinion Corrected The Legal Deficiencies Found In The Prior Opinion.

Judge Aiken upheld this Court's recommended "injunctive relief" as to the ESA claim and also ordered the Fish and Wildlife Service to address several "concerns raised by Judge Clarke" about the challenged BiOp.  ECF # 115 at 4, n.1.  When considering whether to lift the injunction on the underlying agency action—grazing on the Chemult pasture—the court should consider whether the Fish and Wildlife Service complied with Judge Aiken's Order and

corrected the legal deficiencies that rendered the original biological opinion unlawful.  *See, e.g.,*

*Swan View Coal.*, 2010 WL 11530904, at \*5-7 (reviewing new biological opinion for

compliance with ESA when considering motion to lift injunction).  But Defendants did not

bother to file the new opinion, let alone meet their burden to demonstrate it complies with the

Injunction Order.  Thus, the Court should deny Defendants' Motion on this ground as well.

## VI.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the

Defendants' request for expedited relief and their Motion to dissolve the injunction.


Dated: June 14, 2018                                Respectfully submitted,
                                                    /s/Elizabeth H. Potter
                                                    Lauren M. Rule (OSB#015174)
                                                    Elizabeth H. Potter (OSB#105482)
                                                    ADVOCATES FOR THE WEST
                                                    3115 NE Sandy Blvd., Ste. 223
                                                    Portland, OR 97232
                                                    (503) 913-6388
                                                    lrule@advocateswest.org
                                                    epotter@advocateswest.org


                                                    Attorneys for Plaintiffs